ELIZABETH PATRICK, RESPONDENT, v. EMPLOYERS MUTUAL LIABILITY INS. CO. ET AL., APPELLANTS.—118 S. W. (2d) 116.

Kansas City Court of Appeals. May 2, 1938.

*Lacy & Edwards* and *D. L. Dempsey* for respondent.

*Cowgill & Popham, Guy W. Green, Jr., Dan R. Hughes* and *Chas. W. Shelton* for appellants.

BLAND, J.—This is an action for damages, actual and punitive, for the dissection and mutilation of the body of plaintiff's deceased husband. There was a verdict and judgment in favor of plaintiff in the sum of $1500 actual and $6000 punitive damages. Defendants have appealed.

The action was brought against the Employers Mutual Liability Insurance Company (hereinafter referred to as the defendant) and one F. C. Helwig. However, at the close of the evidence plaintiff dismissed as to Helwig.

The facts show that John Patrick, the husband of plaintiff, died on the morning of February 5, 1937; that in his lifetime he was employed by the City of Macon as a fireman and while attending a fire he collapsed, became unconscious and shortly thereafter died. Those who saw the occurrence did not know whether he stumbled or what happened to him. The City of Macon had accepted the provisions of the Workmen's Compensation Act and the Employer's Mutual Liability Insurance Company (hereinafter referred to as defendant) was the

city's insurance carrier. After his death, Dr. Shale, the Mayor of the city, ordered the body taken to the Skinner Funeral Home, conducted by one Albert Skinner in the City of Macon, and to be prepared for an autopsy to be performed thereon. An autopsy was performed on the same date by Dr. Helwig, employed by the defendant for that purpose, without the consent or knowledge of the plaintiff, resulting in this suit.

Dr. T. F. Turner, testifying for the plaintiff, stated that he was County Physician for Macon County on the 5th day of February, 1937; that he was called to the place where Mr. Patrick had collapsed; that when he arrived Mr. Patrick breathed a time or two but the witness could not hear any heart beat and, consequently, pronounced him dead; that Drs. Shale and Howard S. Miller came in as he was leaving for his office; that he signed no certificate of death and was not requested to do so by any one; that he told Dr. Shale that he could not sign such a certificate himself and thought the coroner should be called in.

Dr. Howard S. Miller, testifying for the plaintiff, stated that he was Deputy State Health Commissioner on February 5, 1937; that on that date, he was employed by the defendant, "I take care of their accidents," and was its local physician; that as a part of his duties he gave defendant his opinion "in regard to injured persons" and any other matter in which liability of the insurance company is possible or in prospect; that he knew John Patrick in his lifetime; that he received information from Dr. Shale that something had happened to John Patrick and he went to the place where Patrick lay; that Patrick had died; that he returned to his office and telephoned the claim manager of the defendant in Kansas City; that the claim manager was not in so he talked with Mr. Duckworth, the manager's assistant, and told him about Patrick's death and the circumstances surrounding it; that he advised Duckworth that the cause of the death should be determined through the coroner's office and that he was calling the coroner; that Duckworth told him he would call him back later, which he did and told Dr. Miller that the matter was in his hands and that "they would want me to perform an autopsy on Mr. Patrick." Dr. Miller replied that he was not a pathologist and did not care to perform it. Duckworth said he would get hold of a pathologist in Kansas City and procured Dr. Helwig. Dr. Helwig drove to Macon, arriving there between three and four o'clock that afternoon, going directly to Dr. Miller's office; that by that time Dr. Miller had procured the coroner to come from his home in New Cambria about twenty miles from Macon; that when Dr. Helwig arrived Dr. Miller introduced him to Dr. West, the coroner, and they went up to the funeral home and Dr. Helwig performed the autopsy.

Dr. Miller further testified that he did not recall whether he telephoned the coroner before or after he called the defendant's claim

manager; that his recollection was that he first put in a call for the coroner, could not get him and that he then called the defendant. However, the records of the telephone company for that day show that Dr. Miller called the defendant's claim manager at 10:59 A. M. and that he called Dr. West, the coroner at 10:49 A. M. Dr. Miller further testified that when they arrived at the undertaking establishment the body had been prepared for the autopsy and that he looked at it and found no bruises or lacerations; that Dr. Helwig asked Dr. West, the coroner, if he wanted to perform the autopsy and the latter said "no" and told Dr. Helwig to go ahead, or words to that effect; that the witness and Dr. West remained during the entire period of the operation, but the autopsy was performed by Dr. Helwig alone; that Dr. Helwig took a knife and made an incision running down from the upper part of the body to the lower part of the abdomen so that the entire contents were exposed, and "the flaps laid back;" that a hole was sawed in the back of the head of the body so that the brain could be removed; that Duckworth came to the funeral home just as the autopsy was concluded but remained down stairs and did not go into the operating room.

On cross-examination Dr. Miller testified that he informed Dr. West before the autopsy concerning the circumstances of the death; that he told him that deceased was dead when the witness arrived at the scene of the death and that Dr. Turner, who had arrived thereat before the witness, could not sign a death certificate because he was unable to determine the cause of the man's death without an autopsy. The doctor further testified that, prior to the autopsy, he had a conversation with the Mayor who told him that Mrs. Patrick had neither consented to nor denied them the right to hold an autopsy and that he told this to Dr. Helwig and West; that Dr. West said it was not necessary to obtain her censent and that he was ordering the autopsy himself. The witness further testified that the autopsy did not result in the face of the deceased being mutilated in any way and when the body was dressed no one could tell that an autopsy had been performed; that the witness did not have sufficient information for him to sign a death certificate.

Dr. Helwig, testifying for the plaintiff stated that he was employed by the defendant to perform the autopsy; that Dr. Shale came in when the autopsy was about three-fourths completed; that it required about an hour and 15 minutes to perform it; that he made findings of the cause of the death at the time of the autopsy and informed Dr. West the result thereof when they came down stairs, also Duckworth; that he took sections of the various organs of deceased to Kansas City for examination; that he already had found out the cause of the death; that it was not absolutely necessary to take the sections and microscopically examine them but it was a matter of "routine practice—the purpose of it is scientific accuracy;" that he made a

complete report to the defendant of his findings; that the corner did not pay him anything for his services; that he did not know plaintiff and had no feeling of any kind toward her; that he did not know Mr. Patrick during his lifetime that when he arrived at Macon the coroner told him everything was ready and to go to the Skinner Funeral Home and perform the autopsy; that the coroner was present during all of the time it was in process; that what the witness did was under the instruction and sanction of the coroner; that he had no purpose other than to find out the correct cause of the death and to report it.

Plaintiff admitted, in her opening statement, that she had nothing against Dr. Helwig; that he was one of the best pathologists in the county; that the autopsy was performed in a most scientific and careful manner.

Russell Barber, testifying for the plaintiff, stated that he was the undertaker's assistant; that he procured the body, took it to the undertaking establishment and prepared it for the autopsy at the request of Dr. Shale, the Mayor; that Dr. Helwig took a knife and "separated all this tissue, made a V shape so that it would all be separated and then he took the butcher knife and cut the ribs and sternum in two. Q. How did he cut the ribs, on one side or both sides? A. On both sides;" that Dr. Helwig took out each organ separately, examined it, cut it open and laid it aside; that the Doctor took the intestines out and examined them, then laid them aside; that he then removed the brain, sawing a V shape incision in the back of the head; that after the doctor had removed the organs they were placed in a bucket and disinfected with formaldehyde and each one put back into the body by the witness.

Plaintiff testified that she did not consent to the autopsy or learn of it until about three weeks after her husband was buried; that she did not hear of it "all at once;" that she heard that they had taken her husband's heart and brains out; that she learned "those things from different ones;" that since she learned of it the matter has never been off of her mind; that she can't rest at nights; "I can't sleep, I can't do nothing, just suffer; the children have suffered;" that every time the fire whistle blows she remembers these things; that she and her family associate with her friends they do not enjoy themselves "thinking of the past, . . . We feel the same today as we have felt about it." On cross-examination she testified that she was greatly grieved over the death of her husband before she found out about the autopsy.

On behalf of the defendant, Dr. West, the coroner, testified that Dr. Miller called him about 12:30 of the day in question "and told me that the fire chief, Mr. Patrick, had dropped dead and wanted me to come over and wanted a *post mortem* and I said, all right and I

will ask you to help me and he said he would and he said to come to his office, so after I got through eating why I got in the car and drove over to his office. . . . I met Dr. Miller and he asked me if I was a pathologist and I told him I was not and he said he wasn't either but, he said, I am getting a man from Kansas City and he will be here in a little while, he is on the road, and, he said,—we will just wait if it suits you and I said all right and we waited;'' that when Dr. Helwig arrived they talked over the case and they all of them went to the funeral home in Dr. Miller's car; that Dr. Helwig asked the witness if he desired to perform the autopsy and he said "no" he was not a pathologist, "I will watch you;" that he remained there during the whole time the autopsy was being performed; that he was there solely in his capacity as coroner and had no other business there; that the cause of the death was determined by Dr. Helwig to the satisfaction of the witness; that he saw no reason for empaneling or calling a coroner's jury; that he made out his official records and filed them covering the inquiry; that he had no history of the death, until the autopsy was performed, showing the cause of death and it was necessary for him to have the autopsy performed in order to sign the death certificate; that was the reason he had the autopsy; that the sole purpose in performing it was to learn the cause of the death.

On cross-examination he testified that he did not see the body before he went to Dr. Miller's office that he talked to no one about holding an autopsy except Dr. Miller; that Dr. Miller told him that Patrick had "a fall and that the city of Macon had insurance on him and they would have to have an autopsy, something to that effect, he said there was a fall but I don't remember just what he said about it, we talked it over;" that at first, the witness decided to perform the autopsy; that when Dr. Miller called him he said that Dr. Turner refused to sign the death certificate and he was the only doctor that had been down there at the scene of the death and Dr. Miller said: "'He has some liability insurance and they ask for an autopsy,' and I said, 'All right. I will deputize you to help me' and he said 'All right' and for me to come to the office, and I came to his office and when I got there, he asked me if I was a pathologist and I said, 'No.' He said, 'I am not either,' and he said, 'I am getting one from Kansas City,' and that is all I know about it;" that the witness, himself, had never made an examination of the body; that he got hold of a few witnesses, did not know who they were, and talked to them, one or two, at the undertaking establishment just before the autopsy or right after the time, he didn't remember which; that he thought the witnesses were some men in the fire department; that he had decided to hold the autopsy before talking to them. "Q. And you hadn't any information that John Patrick had been feloniously killed? A. Well, nothing only the fall, the accident, I

don't know whether any accident or anything about it;'' that he never went to the premises where Patrick died; that he told Dr. Helwig to perform the autopsy before he found out anything concerning the matter except what Dr. Miller told him; that the *post mortem* satisfied him as to the cause of death; that he made out the death certificate that evening before he left there; that Dr. Helwig furnished him a report of his microscopical examination and chemical analysis in about ten days or two weeks after the autopsy; that he never went to see Dr. Turner or requested him to make out a death certificate; that the purpose of holding the autopsy was in order for the witness to ascertain the cause of death so that he could make out the death certificate; that ''Dr. Miller wanted it done but it wasn't on his account that it was done. Q. Had Dr. Turner refused to make a certificate? A. Not to me but Dr. Miller told me he had;'' that the matter was not referred to him by the Registrar of Births and Deaths; that Dr. Miller told him he wanted the autopsy because there was some life insurance; that he did not empanel a jury or examine any witness under oath; that he made a report to the county court as the result of his inquiry.

The records of the county clerk show that on March 3, 1937, the coroner filed a statement of his fees and expenses, in connection with an inquest on the dead body of John Patrick, on the regular form provided for that purpose, claiming $5.00 for viewing the dead body and $3.20 mileage, making a total of $8.20; that on March 23, 1937, *three days after this suit was filed,* he filed another report on the matter, which he made out, *with the assistance of the City Attorney of Macon,* stating that he had viewed the body of John Patrick as coroner and found that he had come to his death by reason of a coronary thrombosis.

The evidence further shows that plaintiff filed a claim before the Compensation Commission for compensation for her husband's death.

The petition alleges that John Patrick, while engaged in the scope of his duties as fire chief, was, by accident mortally injured, and died of said injuries soon thereafter; that he was under the provisions of the Workmen's Compensation Act and that defendant, Insurance Company, covered the city's compensation risk; that defendants and the City caused his body to be taken to an undertaking establishment and caused defendant Helwig to cut, saw, mutilate and dissect the body without authority, permission or consent of the plaintiff, his widow; that by reason thereof, plaintiff had suffered great mental pain and anguish; that the act of the defendants in ordering and directing the mutilation and dissection without plaintiff's permission were wilful, wanton and malicious.

It is first claimed that the petition states no cause of action for the reason that plaintiff alleges nothing to affirmatively show that the autopsy was unlawful or that her consent was necessary; that

the autopsy was lawful under the provisions of section 3348, Revised Statutes 1929, subdivision (e), relating to the compensation laws of this State. This section provides that the commission may in its discretion in extraordinary cases order a *post-mortem* examination.

The necessary inference to be drawn from the allegations of the petition is that the autopsy was not held under the order of the Compensation Commission for the petition alleges that it was *performed by the insurance company,* wilfully, wantonly and maliciously.

It is claimed that the petition fails to state a cause of action because an autopsy can lawfully be held in aid of an inquest. However, the petition does not allege that an inquest was held, nor is the cause of action against the coroner. In fact it does not allege that the coroner had anything to do with dissecting the body.

It is claimed that the petition fails to state a cause of action because it does not allege that an autopsy was not necessary to secure a death certificate.

From what we will later say it will become apparent that under the facts alleged in the petition, if the dissecting was done to secure a death certificate, plaintiff was, nevertheless, entitled to recover, and it is unnecessary to pass upon the question whether, under ordinary circumstances, the necessity of securing a death certificate would not be a matter of affirmative defense to the action.

It is also insisted that the petition affirmatively alleges facts showing that plaintiff's remedy was exclusively under the compensation act. In view of this contention it is well to inquire into the nature of the cause of action in cases of this kind. In such cases the widow does not sue on the theory that the corpse is property in the commercial sense, but rather that she has a *quasi*-property right in the remains of her husband, entitling her to the possession and control of the body for the purpose of preparing and interring it decently. [*Wall* v. *St. Louis-San Francisco R. R. Co.,* 184 Mo. App. 127; *Litteral* v. *Litteral,* 131 Mo. App. 306; *Wilson* v. *Railroad Co.,* 160 Mo. App. 649.]

It is well stated in Hill v. Travelers Ins. Co., 154 Tenn. 295, 303: "The damages recoverable in such a case are not for the injury done to the dead body, but are for the wrong or trespass on the plaintiff's right to the undisturbed possession and control of the body, measured by the mental anguish and suffering of the plaintiff occasioned thereby. Clearly this is not an action for 'injuries to the person.' " It is quite apparent from the nature of the cause of action that compensation for plaintiff's injuries, sustained after the death of her husband and in no way connected with the cause of his death, could not be made under the compensation act.

It is insisted that the court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence. In this connection it is stated that the evidence, even when taken in its most

favorable light to plaintiff, shows that the autopsy was legally and lawfully held and that, in view of the fact that it was properly made and that no mutilation of the body occurred, plaintiff is not entitled to recover. This will require an examination into the statutes relative to the holding of inquests and autopsies.

Section 11608, Revised Statutes 1929, provides: "The coroner shall be a conservator of the peace throughout his county, and shall take inquests of felony and casual deaths happening in the same, or where the body of a person coming to his death shall be discovered in his county.

Section 11612 provides: "Every coroner, as soon as he shall be notified of the dead body of a person, supposed to have come to his death by violence or casualty, being found within his county, shall make out his warrant, directed to the constable of the township where the dead body is found, requiring him forthwith to summon a jury of six good and lawful men, householders of the same township, to appear before such coroner, at the time and place in his warrant expressed, and to inquire upon a view of the body of the person there lying dead, how and by whom he came to his death."

Section 11631 provides: "When a physician or surgeon shall be called on by the coroner, or any magistrate of the county acting as the coroner, to conduct a *post-mortem* examination, the county court of said county shall be authorized to allow such physician or surgeon to be paid out of the county treasury any sum as a fee not exceeding ten dollars, to such physician or surgeon who may be engaged in said examination."

Under the provisions of these sections it seems apparent that the coroner has no authority to perform an autopsy under the circumstances here present, or have one performed, except in connection with an inquest to be held before a coroner's jury. It could hardly be said that section 11631, even standing alone, authorizes an autopsy, under any circumstances that the coroner might in his judgment, see fit to hold it for, on its face, it does not purport to be an authorization of that kind, but merely a section dealing with fees for the performance of an autopsy. Of course, it is beyond the realm of probability that the Legislature ever intended to confer upon a coroner the right to perform an autopsy in any case that, in his judgment, he might deem proper, for this would empower him to enter the homes of our citizens indiscriminately and over their protests remove corpses under any circumstances, regardless of the cause of death, provided that the coroner thought an autopsy, in a particular case, would further the advance of science or some purpose believed desirable by him. The Legislature had no intention to confer any such authority upon the coroner. Section 11631 must be read in connection with the whole chapter in which it appears relating to "inquests and coroners." In no place in the chapter is the coroner

authorized to hold an autopsy under the circumstances here present except in connection with an inquest, to be held before a jury, of persons supposed to have come to their deaths by violence or casualty, the latter term including accidents. In view of the circumstances surrounding Patrick's death the coroner, in his discretion might have conducted an inquest but there was none held and, therefore, the coroner had no authority to hold an autopsy. Indeed, there was evidence that it was not the intention of the coroner to hold an inquest as he testified that the autopsy was performed merely that he might have information upon which to make out a death certificate but, aside from this, while it might be desirable for the coroner to hold an autopsy to ascertain if an inquest should be held, the statute gives him no such authority.

Defendant relies, in part, upon section 11636 as justifying the autopsy in this case. That section has to do with the matter of the payment of fees of jurors, witnesses and interpreters, at any view or inquest, out of money advanced the coroner by the county court from county funds. It further provides: "It shall be the duty of the coroner to summon to the view or inquest only such number of witnesses as, from a preliminary inquiry into the nature of the case, and the cause of the death, may reasonably appear sufficient to prove the essential facts thereof; and if it shall appear to the county court that any witness had been unnecessarily summoned to testify at a view or inquest, the fees paid as aforesaid to such witness shall not be allowed in favor of the coroner in the settlement of his account for the money so advanced to him as aforesaid, except in a case in which some credible person shall have declared, under oath, to the coroner, that the person whose body is to be viewed came to his death by violence, or other criminal act of another, the coroner shall not summon any jury, but shall himself view the body and declare the cause of death."

Defendant relies upon that part of section 11636 beginning with the word "except" as follows: In this connection defendant urges that this part of section 11636 directs that the coroner shall not call a jury but shall himself view the body and declare the cause of death, unless the death was caused by violence (which is not this case) and, since, in this case the coroner was of the opinion that it was necessary to perform an autopsy in order for him to declare the cause of the death and since, in this State, a coroner is necessarily clothed with discretion in the performance of his duties which are judicial in character, plaintiff's testimony shows affirmatively that the autopsy was legally and properly held by him.

Section 11636 is primarily, if not exclusively, a fee statute. That part of the section beginning with the word "except" is very unusual not only in its construction, as to the language used, but in the way it is connected with the rest of the section. While, it apparently

recognizes the power in the corner to dispense with a jury and declare the cause of death himself when some credible person shall declare under the oath that the person whose body is to be viewed came to his death by violence the whole section is one on the subject of fees and the proper construction of that part beginning with the word "except" would seem to be that it shall not be considered that witnesses are unnecessarily summoned where the coroner elects, under the circumstances mentioned in the statute, to declare, himself, the cause of the death of course under such circumstances, the necessity of a hearing of testimony by a jury is obviated.

In the case at bar there was no oath of any person that the deceased came to his death by violence and that part of section 11636 in question has no application. Consequently, it is unnecessary for us to say whether the coroner would have authority to hold an autopsy where no jury is summoned under the circumstances mentioned in that part of section 11636 in controversy.

However, it is urged that, even though the coroner mistakenly thought that he had the power to hold an autopsy, being of the opinion that it was necessary and that he had the power to order it, in doing so he acted in his judicial capacity and defendant is protected.

There is conflict in the authorities as to the capacity (judicial or ministerial) in which a coroner acts in performing his duties. Some of the authorities are to the effect that they are judicial in character, others *quasi*-judicial and others ministerial, depending what the act performed. In this State a coroner acts judicially in respect to determining whether an inquest shall be held. [Boisliniere v. The Board of County Commissioners, 32 Mo. 375.] However it was stated in Queathman v. Modern, 148 Mo. App. 33, 48, that aside from this, there is nothing in the statute according the force and effect of a judicial proceeding to an inquest, itself. If this is true, of course, there is nothing judicial about the calling or holding of an autopsy. However, we are not concerned with this matter, for, as we have already stated, the coroner had no authority, so far as the facts in this case are concerned, to hold an autopsy except in connection with an inquest before a jury and in performing the one in question the coroner was not acting in any capacity but entirely outside of his office.

In this connection there was evidence from which the jury could conclude that there was nothing less than an abuse of his office on the part of the coroner in permitting the autopsy in question, although he sought to justify his conduct on the theory that it was necessary for him to sign a death certificate. From what we will hereinafter say, the coroner was not called upon to make a death certificate in this case but regardless of this there is enough testimony to show that his only purpose is consenting to an autopsy was to assist Dr. Miller, who was acting as an agent of the defendant, in obtaining evidence to be

used in a compensation proceeding by the plaintiff. In other words, he permitted the authority of his office be used as a cloak or cover for the purpose of aiding defendant in obtaining in a compensation case. It goes without saying that the coroner in the execution of the duties conferred upon him by law, acts for the public and not for the purpose of furthering the private interests of members of it.

While the coroner, during his testimony, sought to justify the autopsy on the ground that he was seeking evidence upon which to base a death certificate, in other places we find him saying that he held the autopsy on account of Dr. Miller wanting it because there was compensation insurance involved and the autopsy was requested. But regardless of the coroner's motives and purposes, how can defendant claim the protection of his office in view of what it did? There was evidence that Dr. Miller began arranging for an autopsy even before he notified the coroner of the death; that defendant procured the services of Dr. Helwig without consulting the coroner and had Helwig go from Kansas City to Macon before it knew that his services were acceptable to the coroner. The coroner had nothing to do with the arrangements for the autopsy. The body of Patrick was prepared for an autopsy before the coroner heard anything about the death. Dr. Miller caused the coroner and Dr. Helwig to come to his office where they were introduced and they then went to the undertaking establishment in Dr. Miller's car. Dr. Miller knew that the coroner had talked to no person who knew anything about the cause of the death. The coroner said he might have talked to some of the firemen before the autopsy was performed but that he had made up his mind to consent to it before he saw these witnesses. Dr. Miller persuaded him to consent to it even before Dr. Helwig arrived. Dr. Miller did not ask the coronor if an autopsy could be performed but said one would be required because of compensation insurance. Regardless of whether the coroner was acting in good faith in the matter Dr. Miller was not, so far as proceeding lawfully in the matter. His sole purpose was to obtain evidence for his employer, the defendant, for a compensation case.

It is claimed by the defendant that the autopsy was properly performed for the purpose of the death certificate. It being pointed out by the defendant that under the provisions of our statute, Article 2, Chapter 52, relative to the registration of births and deaths, it is necessary to have a death certificate before a corpse may be buried and making a crime to buy one without a permit issued by the registrar based upon a proper certificate of death, and that the evidence shows that there was no person who would issue a death certificate in this case; that none could have been issued without an autopsy having been performed.

There is no provision in Article 2, Chapter 52 of the statute empowering the coroner to make a death certificate, except under the

provisions of section 9047. Said section authorizes the coroner to make such certificate when the case is referred to him by the registrar as a case without an attending physician and one where the death may have been caused by unlawful or suspicious means. In such a case the coroner, *whose duty it is to hold an inquest on the body of the deceased,* may make the death certificate required for a burial permit. [O'Donnell v. Wells, 21 S. W. (2d) 762, 765.]

None of the circumstances outlines in section 9047 empowering the coroner to make a death certificate were present in the case at bar. He had no authority to make it, in any event, and, as before stated, there is evidence from which the jury could say that it was held to accommodate Dr. Miller.

We have examined the cases cited by defendant and find them not in point. In the case of Young v. College of Physicians and Surgeons, 32 Atl. (2d) 177, there was an ordinance of the City of Baltimore making it the duty of the coroner to make death certificates, generally, in any case coming within his notice. In Huntly v. Zurich Gen. Accd. & Life Ins. Co. (Colo.), 280 Pac. 163, an inquest was held. The facts present and the statutes or ordinances construed in Darcy v. Presbyterian Hospital, 114 N. Y. S. 1052; Kingsley v. Forsyth (Minn.), 257 N. W. 95, and Rushing v. Medical College of Georgia (Ga.), 62 S. E. 563, were entirely different from those in the case at bar and applicable thereto. In Cook v. Walley (Colo.), 27 Pac. 950, a *post-mortem* examination was made by the person required to make the death certificate. The court gave several reasons why recovery could not be had in that case. We need not decide whether, in this State a person empowered to make a death certificate may perform an autopsy without the consent of those entitled to the body for burial.

We have examined the other cases cited by defendant and find them not in point.

It is insisted that the court erred in refusing to give defendant's Instruction 2½, which reads as follows:

"The court instructs the jury that if you find and believe from the evidence in this case that Dr. Helwig, performed the *post-mortem* examination of John Patrick, as shown by the evidence, at the request and in the presence of Doctor West, the then Coroner of Macon County, Missouri, then your verdict must be in favor of the defendant, insurance company, and against the plaintiff."

From what we have said there was no error in the refusal of this instruction.

On behalf of the plaintiff the court gave plaintiff's instructions A, B and C. Instruction A told the jury that plaintiff was entitled to the possession of the body of deceased for the purpose of perserving and preparing it for burial and for burying it; that if Dr. Helwig was employed by the defendant and that the defendant, "without

the consent of plaintiff and wilfully, wantonly, maliciously and unlawfully, caused, procured, ordered and directed the said F. D. Helwig to cut, saw, mutilate and dissect the body of the said John Patrick and further find and believe from the evidence that the said F. C. Helwig, on said 5th day of February, 1937, did cut, saw, mutilate and dissect the body of the said John Patrick without the consent of the plaintiff, wilfully, wantonly, maliciously and unlawfully, and that by reason of said cutting, mutilation and dissection plaintiff suffered mental pain and anguish, their verdict should be for plaintiff.

Instruction B is as follows:

"The court instructs the jury that if, under the evidence and instructions of the court, you find in favor of plaintiff, you should assess her actual damages at such an amount as you believe, from the evidence, will be a fair and reasonable compensation to her for the injured feelings and mental anguish, if any, which she has suffered on account of the mutilation of her deceased husband's body, if it was, and for such mental anguish, if any as in all probability she will suffer in the future on account of the mutilation of the dead body of her deceased husband, and, if you find that her deceased husband's dead body was wilfully, wantonly, maliciously and unlawfully and without any just cause, mutilated and dissected by the defendant, you may assess a further sum, by way of punitive damages, that will be a punishment to defendant and as a warning to others, and you will state the amount of actual and punitive damages awarded, separately, in your verdict, if you so find. You cannot assess punitive damages unless you find plaintiff suffered actual damages."

Instruction C told the jury that if they found that the acts of the defendant were wilful, wanton, malicious and unlawful, in addition to actual damages, they might assess against the defendant, by way of punishment for the wrongful act, exemplary of punitive damages, and that "The word 'maliciously' as used in the above instructions does not mean hatred, spite, or ill will, as commonly understood, but means a wrongful act intentionally done without just cause or excuse, and by the word 'wilful' is meant intentionally and not by accident or mistake."

It is insisted that Instruction A is erroneous because it is broader than the pleadings, in that, it submits that the act of cutting, etc., of the body was unlawfully done, while the petition merely alleges that it was wilfully, wantonly and maliciously done. The word "unlawful" is a legal term. If it had been used in the petition it would have added nothing to it. The petition alleged sufficient facts to show that the autopsy was unlawfully performed and, in having the jury find that the autopsy was so performed, plaintiff assumed an unnecessary burden.

However, it is claimed that in requiring the jury to find that the act complained of was wilfully, wantonly, maliciously and unlawfully ordered and performed, the instruction permitted the jury to indulge in speculation and conjecture as to what constituted unlawful and malicious conduct and the instruction should have told the jury what facts must be found in order to constitute defendant's act unalwful, etc. In this connection, among other authorities, defendant cites Zemlich v. A. B. C. Auto Sales & Inv. Co., 660 S. W. (2d) 649; Pogue v. Rosengrant, 98 S. W. (2d) 528.

In the first case it was held that the acts of the defendant mentioned in evidence that were wilful, malicious and wanton, should have been submitted, rather than the entire evidence, generally, so that the jury could not mistakenly take into consideration other acts. Plaintiff's instruction is not subject to this criticism.

In Pogue v. Rosengrant, *supra,* some of the acts shown in the testimony authorized punitive damages and others did not. Therefore, a general instruction concerning the matter was held to be erroneous. The instruction in the case at bar is not subject to that criticism.

It is insisted that the court erred in giving Instruction B for the reason that it is claimed that plaintiff is entitled to merely nominal damages and not to recover for mental anguish, because no physical injury was shown and there was no evidence of wilfullness and wantonness; that even if the autopsy were unlawfully performed, the evidence shows that it was performed in a lawful *manner* but under a mistaken belief as to its legality and there is no evidence of express malice; that the autopsy was admittedly scientifically and properly performed; that in the absence of actual malice, there must have been evidence of the intentional doing of a wrongful act without *legal* justification or excuse.

There was ample testimony of legal malice in this case and such malice is sufficient to authorize a recovery for the mental anguish suffered. [Lampert v. Drug Co., 238 Mo. 409, 419.]

As before stated, there was evidence that the autopsy was unlawful and that it was held, not for the purpose of discovering any matter in which the public had any interest, but for the sole purpose of helping defendant in resisting, if necessary, plaintiff's claim before the Compensation Commission. There was ample evidence from which the jury could say that it was not only wrongful, but that it was known to be wrongful on the part of the defendant. This was shown by the conduct of the defendant in procuring the presence of the coroner, knowing that an autopsy could only be performed under his direction, if at all, and using him as a mere screen in an effort to protect it in its undertaking. Therefore, the evidence comes within the rule laid down in Hall v. St. Louis-San Francisco Ry. Co., 28 S. W. (2d) 687, 691, cited by defendant, as follows: *"The party must know that the act is wrongful and must do it intentionally with-*

out just cause or excuse. If he acts in good faith and in the honest belief that his act is lawful, he is not liable for punitive damages even thought he may be mistaken as to the legality of his act. [Bean v. Branson, 217 Mo. App. 399, 408, 409, 266 S. W. 743.]'' [Lampert v. Drug Co., 238 Mo. 409, *supra*.] (Italics ours.)

Defendant insists that the evidence shows that the autopsy was performed in good faith and under the belief that it was necessary and lawful. Under all of the circumstances the jury could have found to the contrary.

It is insisted that the court erred in giving Instruction C because it erroneously defined the word ''malicious'' as being a wrongful act intentionally done without just cause or excuse, whereas, defendants says, malice is properly defined as a wrongful act done intentionally without *legal* justification or excuse, citing *Waddell* v. *Kranse*, 241 S. W. 964, 966. The court there said that the instruction could be in the words suggested by defendant or words of similar import. The language used in the instruction is in the approved form. [Gray v. Phillips Bldg. Co., 51 S. W. (2d) 181, 185; Hall v. St. Louis-San Francisco Ry. Co., *supra*; Ferguson v. Mo. Pac., 177 S. W. 616, 618; McNamara v. St. Louis Transit Co., 182 Mo. 676, 681; Dickensheet v. Mining Co., 202 S. W. 624, 627; Bean v. Branson, 266 S. W. 743, 745.] It is claimed that the instruction is erroneous because it fails to tell the jury that punitive damages should be allowed only, in their discretion. The instruction used the word ''may'' and was not erroneous.

It is insisted that the court committed error in refusing to permit Dr. Miller to testify that there was no unnecessary cutting, other than is done in a conventional autopsy. There was no error in the refusal of this testimony, for the reason it was admitted at the trial that if the autopsy was legally performed it was done properly and in a scientific manner.

It is insisted that the verdict is excessive. In this connection it is said that the verdict for actual damages is too large for the reason it is impossible to tell from plaintiff's testimony whether her mental anguish was caused solely by the autopsy or, in part, by the mental anguish she underwent by reason of the loss of her husband. We think plaintiff's testimony is plain enough on this subject and we are not disposed to interfere with the verdict for actual damages. The evidence shows that plaintiff's sufferings were long and continued as a result of the unlawful acts of the defendant.

Defendant contends that the punitive damages are out of proportion with the actual damages. Generally, punitive damages must bear some relation to injury inflicted and cause thereof, though they need not bear any relation to damages allowed by way of compensation. [State ex rel. v. St. Joseph Belt Ry. Co., 108 S. W. (2d) 351.]

While the verdict for punitive damages is large, the circumstances under which the wrong was committed are aggravated and we do not feel that we would be justified in interfering with that part of the verdict.

The judgment is affirmed. All concur.