Jo Madeline Crenshaw, (Plaintiff) Respondent, v. Dr. John O'Connell, (Defendent) Appellant.—150 S. W. (2d) 489.

St. Louis Court of Appeals. Opinion filed May 6, 1941.

*Hay & Flanagan* for respondent.

*Herbert W. Ziercher* for appellant.

BENNICK, C.—This is an action by plaintiff, the widow of one Oliver Albert Crenshaw, to recover the damages sustained on account of the action of defendant, Dr. John O'Connell, the coroner of St. Louis County, in having an alleged unauthorized and unlawful autopsy performed upon the body of her husband, who died in St. Louis County on January 14, 1939.

Tried to a jury in the Circuit Court of the City of St. Louis, a verdict was returned in favor of plaintiff, and against defendant, for $5000 actual damages and $5000 punitive damages. As a condition to the overruling of defendant's motion for a new trial, the court ordered a *remittitur* of the whole amount of punitive damages awarded; and following plaintiff's entry of such *remittitur*, the mo-

tion for a new trial was overruled and judgment entered in plaintiff's favor for $5000 actual damages and costs, from which judgment defendant has perfected his appeal to this court in the usual course.

The deceased, at the time of his death, was in the employ of the Donnelly Company, the manufacturer of a lotion product, which had space in a building located at 6239 St. Louis Avenue, in Wellston, Missouri.

Plaintiff last saw her husband alive at 8:30 o'clock in the morning of the day of his death, when he took her down town to her place of employment with Stix, Baer & Fuller Company, a mercantile establishment.

The deceased then reported for his own work, and gave no indication of anything unusual in his condition until about 11:30 o'clock in the morning, when two men, the one, Hayden, a resident in the neighborhood, and the other, Wood, an employee of a concern which jointly occupied the building with the deceased's employer, found the deceased lying on the sidewalk in front of the building, where he had fallen momentarily before.

Ascertaining that the pulse was still beating, Wood and Hayden placed the deceased in an automobile and drove to the office of Dr. Hicks, an osteopath located in the immediate vicinity, who pronounced the deceased to be dead, and then notified defendant, the coroner, who in turn instructed an undertaker to bring the body to the morgue in the St. Louis County Hospital.

Wood had had some slight acquaintance with the deceased, and although both he and Hayden had given their names to the ambulance driver who came out for the body in response to defendant's direction, no inquiry was ever made of either of them on behalf of the coroner's office with respect to the circumstances under which the deceased's body had been found.

Indeed, the only investigation that defendant purports to have made was in connection with his communication with Dr. Hicks who advised him that the deceased had reportedly fallen over dead while working with two men whose names and addresses were given, after which, without himself examining the body, without attempting to contact the relatives of the deceased although his name and home address appeared upon two envelopes found upon his person, and without ordering an inquest to be held, he directed an autopsy to be performed, according to his usual custom in such matters, by the Department of Pathology in the Medical School of Washington University.

Such autopsy was thereafter performed between the hours of three and six o'clock that afternoon by Dr. Mantz of the medical school in the presence of a group of students, and as a result it was found that the deceased had died of a cerebral hemorrhage, which fact defendant

then certified as the cause of death in the certificate of death which he executed over his signature as Coroner of St. Louis County.

Following the completion of the autopsy, the body was delivered to an undertaker who had been engaged at the instance of a cousin of the deceased; and it was not until some time after the funeral that plaintiff learned that the autopsy had been performed.

The deceased's cousin, incidentally, had received word of the deceased's death from the Donnelly Company, and he in turn not only notified plaintiff at her place of work, but also took her out to the St. Louis County Hospital at two o'clock in the afternoon for the purpose of securing whatever information they might regarding the *status* of the case. It appears, however, that neither of them was given any information by the persons from whom they inquired, save that the cousin was advised to make arrangements with an undertaker to take charge of the remains.

As we have already pointed out, the whole question, under the pleadings, was whether the autopsy was wrongfully and unlawfully performed so as to have rendered defendant liable to plaintiff for the damages she sustained by reason of it; and as a matter of chief insistence on this appeal defendant urges that the evidence did not make out a submissible case for the jury upon such issue as against his request for a peremptory instruction at the close of the entire case.

The coroner, as we know him in this State, is a constitutional officer (Mo. Const., art. 9, secs. 9, 10 and 11), whose powers and duties with respect to the holding of inquests and autopsies are more or less specifically defined and limited by statute, the same being sections 13227-13268, Revised Statutes of Missouri, 1939 (Mo. State. Ann., secs. 11608-11649, pp. 4279-4290).

The above sections of the statutes have but recently been construed (and we think correctly so) by the Kansas City Court of Appeals in the case of Patrick v. Employers Mutual Liability Insurance Co., 233 Mo. App. 251, 118 S. W. (2d) 116, an action by a widow against a compensation insurer for damages sustained on account of the mutilation of her deceased husband's body in connection with an autopsy which the coroner unlawfully permitted to be performed at the instance and for the benefit of the defendant insurer.

That case holds squarely that under such circumstances as confronted defendant in the case at bar, the law invests the coroner with no authority to have an autopsy performed except in connection with, and as an incident to, an inquest to be held before a jury upon the body of a person supposed to have come to his death by violence or casualty, the purpose of the inquest being to inquire, upon a view of the body, how and by whom such person came to his death; that while the coroner acts judicially, and has a discretion, with respect to determining whether an inquest shall be held, neither the inquest itself, nor the calling and holding of an autopsy in connection with it,

is a proceeding judicial in character so as to relieve the coroner from civil liability for his acts in relation to it; that it was never intended that the coroner should have the right to order an autopsy performed in any case where, in his mere judgment, an autopsy might be deemed proper for any such reason as the advancement of science or the like; and that while it might or might not be thought desirable that the coroner should have the power to hold an autopsy in order to determine whether an inquest should be held, the law gives him no such authority, so that in the case at least of a person who is merely supposed to have come to his death by violence or casualty, an autopsy performed except in connection with an inquest is unlawful and illegal, regardless of what might be the coroner's good faith in the exercise of a mistaken authority in the matter.

It is true, as was noted in the course of the Patrick case, that certain sections of the statutes, and particularly section 13255, Revised Statutes of Missouri, 1939 (Mo. Stat. Ann., sec. 11636, p. 4286), would seem to contemplate that in a case where the dead person is not merely "supposed" to have come to his death by violence or casualty, but where some credible person has declared under oath to the coroner that the person whose body is to be viewed came to his death by violence or other criminal act of another, the coroner may dispense with a jury and himself view the body and declare the cause of death. We observe, however, that the court, in the Patrick case, reserved its decision upon the question of whether, under such circumstances, the coroner would have the authority to conduct an autopsy, and neither shall we determine the point, since in the case at bar, just as in the Patrick case, there was no declaration under oath by any person as to the circumstances under which the deceased had come to his death so as to have entitled defendant to refrain from holding an inquest, and, upon a coroner's view of the body, himself declare the cause of death.

Of course, if plaintiff, as the one entitled to the right of sepulture, had given her consent to the autopsy, there would have been no liability on defendant's part (in the absence of a performance of the autopsy in an improper manner), even though no inquest was held or basis afforded for defendant himself to have declared the cause of death upon a mere coroner's view of the body. However, neither plaintiff, nor any one for her, gave such consent, and consequently the autopsy must be held to have been unlawfully and illegally performed, unless it should be, as defendant also contends, that he was justified in ordering the autopsy so as to be able to sign a death certificate.

As to this, suffice it to say that under the statute having to do with the coroner's duties in respect to registration of deaths (Sec. 9767, R. S. Mo. 1939 [Mo. Stat. Ann., sec. 9047, p. 4191]), the coroner is authorized to make a certificate of death only when the case is re-

ferred to him by the local registrar as one without an attending physician and one where the circumstances of the case render it probable that the death was caused by unlawful or suspicious means. The purpose of such reference is, of course, to have an investigation by the coroner as the officer whose duty it is to hold an inquest on the body of any deceased person; and when such a case is properly referred to the coroner, he conducts his investigation, and then executes the certificate of death required for a burial permit, stating therein the disease causing death or the means of death, and otherwise making the same conform to the requirements of the statute. [O'Donnell v. Wells, 323 Mo. 1170, 21 S. W. (2d) 762; Patrick v. Employers Mutual Liability Insurance Co., *supra*; Gilpin v. Aetna Life Insurance Co., 234 Mo. App. 566, 132 S. W. (2d) 686.]

In the case at bar, not only was the deceased receiving treatment from a doctor for high blood pressure up to the very time of his death, but, in addition, the case was concededly not referred to defendant by the registrar for his investigation and certification. Neither was defendant requested by the relatives or friends of the deceased to hold a view or inquest on the body for the purpose of issuing a certificate of the cause of death (Sec. 13253, R. S. Mo. 1939 [Mo. Stat. Ann., sec. 11634, p. 4285]), and so for the want of any of the circumstances empowering the coroner to make a death certificate, the autopsy performed upon the body of the deceased is not to be justified upon any such ground.

There was a case, under the facts, for submission to the jury, and defendant's request for a peremptory instruction was properly refused.

A point is made that the court erred in refusing to permit Dr. Mantz, the autopsy physician, to answer a question directed to him by defendant's counsel on cross-examination as to whether the cause of death could have been ascertained without an autopsy. The objection which the court sustained was put upon the ground that the question at issue was not whether the cause of death could have been ascertained without an autopsy, but whether defendant had in any event possessed the legal right to direct the performance of the autopsy. However effective an autopsy might have been as a means of revealing the true cause of death, such a consideration could not have excused its performance without legal authority therefor; and in the absence of such authority, the matter of its desirability was irrelevant to the case, unless, perhaps, upon the question of defendant's good faith, which his counsel is not urging in this court for the reason, no doubt, that it related primarily to the issue of punitive damages which was taken out of the case by plaintiff's action in remitting the whole amount of the punitive damages awarded.

There is the further point that the court erred in permitting witnesses for plaintiff to testify to the effect that defendant did not get

in touch with the family or make any effort to ascertain whether or not the deceased had been treated by a physician prior to his death. While it is true that such testimony was given, the record discloses no objection to it, and the question of whether it was properly admitted is consequently not here for our review.

This brings us to the final, and a very serious, point in the case as to whether the award of $5000 actual damages is excessive.

In her petition plaintiff limited her allegation of damage to the "great mental pain and anguish and suffering" to which she had been subjected by reason of the autopsy performed upon the body of her husband, and in her testimony she showed no more than that after learning of the autopsy, she was not able to go back to work for some time; that the idea of an autopsy was foreign to her wishes; that she was unable to think of her husband without at the same time thinking of "what took place;" that she would lose control over her emotions and find herself crying; that the matter affected her to the point where she was unable to do her work properly; and that since the death of her husband, she had felt that she could not attend the funerals of other people.

Plaintiff's sister-in-law testified that "before Mrs. Crenshaw learned of the autopsy she would talk with me, but afterwards she would go to her room alone and lock herself up and have a big crying spell and cry sometimes for hours."

While damages for mental anguish are ordinarily not recoverable unless connected with some physical injury, the trend of modern authority is not to apply such restriction in the case of interference with rights involving dead human bodies, where mental anguish to the surviving relatives is not only the natural and probable consequence of the character of wrong committed, but indeed is frequently the only injurious consequence to follow from it. [Wilson v. St. Louis & S. F. R. Co., 160 Mo. App. 649, 142 S. W. 775; Wall v. St. Louis & S. F. R. Co., 184 Mo. App. 127, 168 S. W. 257; Patrick v. Employers Mutual Liability Insurance Co., supra; Coty v. Baughman, 50 S. D. 372, 210 N. W. 348; 15 Am. Jur., Dead Bodies, sec. 35; 17 C. J. 1147.]

The chief trouble lies in attempting to measure the damages by something so wholly intangible and incapable of substantial valuation as mental pain and suffering. That difficulty, however, does not prevent the application of the ordinary principles of the law of damages, with both court and jury performing their usual functions in determining what shall constitute reasonable compensation under the circumstances of the particular case.

In the case at bar, the autopsy was performed in a proper and scientific manner as was shown by the testimony of the autopsy physician who was plaintiff's own witness, and that this was so was further emphasized by the fact that plaintiff did not discover what had been done until some time after the funeral had been held. In

other words, there was no mutilation of the body visible to the eye, which, if that had occurred, would have been a highly aggravating circumstance strongly affecting the degree of mental suffering which might have been reasonably expected to ensue.

Then, too, there is the further important circumstance that while plaintiff undoubtedly suffered mental anguish in more or less degree from the mere knowledge that even a proper autopsy had been performed, a state of grief on her part was none the less a natural consequence of the death of her husband in and of itself, and there was nothing to show that the reaction of which she complained was materially different from that which would have followed in any event if there had been no autopsy performed upon the body.

The reported cases indicate without exception that awards of actual damages for mere mental anguish in cases of this character are invariably held to fairly moderate figures. The case of Patrick v. Employers Mutual Liability Insurance Co., *supra,* is a case very similar on the facts, and the award of $1500 actual damages which was allowed to stand in that case would seem to furnish an accurate guide beyond which the limits of reasonable compensation for actual damages should not be permitted to extend in the absence of special and unusual circumstances.

The Commissioner accordingly recommends that if plaintiff will, within ten days, remit the sum of $3500, the judgment of the circuit court shall be reversed and the cause remanded with directions that a new judgment be entered in favor of plaintiff, and against defendant, in the sum of $1500, with interest thereon at the rate of six per cent per annum from February 15, 1940, the date of the original judgment; that otherwise, the judgment be reversed and the cause remanded for a new trial.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed and the cause remanded with directions as recommended by the Commissioner, provided plaintiff enters a *remittitur* of $3500 within ten days; otherwise the judgment is reversed and the cause remanded for a new trial. *Hughes, P. J.,* and *McCullen* and *Anderson, JJ.,* concur.