GERALDINE GILPIN, RESPONDENT, v. AETNA LIFE INSURANCE COMPANY, APPELLANT.—132 S. W. (2d) 686.

Kansas City Court of Appeals. July 3, 1939.

*Morrison, Nugent, Berger, Byers & Johns, Chas. C. Byers* and *Robert L. Hecker* for appellant.

*Allan R. Browne* and *Wilbur B. Ennis* for respondent.

BLAND, J.—This is an action upon a life insurance policy, in the sum of $2000, issued by the defendant upon the life of insured, Wilber E. Gilpin and, in which plaintiff, the wife of the insured, is named as beneficiary.

The policy contained a double indemnity provision, providing for the payment of an additional $2000, if insured's death resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means, etc., providing such death did not result from suicide while sane or insane. There was a verdict and judgment in favor of plaintiff in the sum of $2090 and defendant has appealed.

On August 22, 1936, the insured, Wilber E. Gilpin, died from a gunshot wound that day made in his head. Proof of death was made by the plaintiff under the life insurance provision of the policy and the sum of $2000 was paid to her and the policy surrendered by her to the defendant. No other claim was made under the policy at that time but, about a year later, plaintiff made an additional claim under the double indemnity provision in the policy. Defendant denied liability under that provision, resulting in this suit.

The main issue at the trial was whether deceased died as a result of suicide or accident.

The facts show that deceased left home, in Kansas City, in his automobile about 9:00 A. M., of August 22, 1936, stating to the plaintiff that he was going to take a friend to Wildwood Lake. This was the last time plaintiff saw him. He was next seen that day when he called at his brother's house about 12:00 M. or 1:00 P. M. and borrowed a revolver, saying to his brother that he was going to the river to shoot frogs. On occasions before he had gone to his brother's house and borrowed one of the three revolvers that the brother owned. He was next seen about 2:00 P. M. of the same day, when he stopped at a filling station on Van Horn Road, a block or two east of the city limits of Kansas City, and purchased three gallons of gasoline from Lee Tubbs, one of the attendants there. Deceased, Tubbs, Ione Johnson (Tubbs' sister) and her husband, Hainey Johnson, had been friends for some time. Tubbs lived with the Johnsons. Deceased told Tubbs that he wished to see Johnson and that he was going to the latter's house. Johnson's house was located at 1611 Alice Street outside the city limits, a short distance from the filling station. As

Tubbs was going off duty at the time, he went along with deceased in the latter's car to the Johnson house. · The house was located on the east side of a short oiled road (Alice Street) running generally in a north and south direction. Alice Street was not cut through to Van Horn Road.

When they reached the house, deceased inquired of Mrs. Johnson if her husband was at home. Finding that he was not there, he drove his car a short distance south where there was a "Y" or a fork in Alice Street. It had been the habit of deceased, when calling at the Johnson home, to go to this fork and drive down the right side of the "Y" a short distance, then back his car up around the "Y," in order to turn around. Neither Tubbs nor Mrs. Johnson saw the car reach the "Y" and did not know what happened there.

Mrs. Sexton, a witness for the defendant, testified, that she lived at 1628 Alice Street, which was on the west side thereof, almost opposite the Johnson home, but a little to the south; that she saw deceased in his car when it was standing in front of the Johnson house; that at that time she was standing in her front room close to the front door, ironing; that she saw him start up to go to the "Y" and watched him go down the righthand side of the "Y;" that when he left the Johnson house he "left terribly fast;" that when he got to the "Y" he slowed down; that she thought he was going to turn around "but when he stopped he just came to a slow stop, he didn't stop real fast . . . just an ordinary stop;" that she then walked from the door back to her ironing-board where she was ironing on a table cloth, when she heard a shot; that she looked out the door and, seeing nothing, went back to her ironing; that she then heard her little girl scream; that she then went across the street and informed the Johnsons what had happened.

Tubbs went to the car and thence to Van Horn Road and procured two Kansas City police officers and returned to the scene with them. He did not examine Gilpin or his car.

Mrs. Johnson said she went to the scene and mingled with the crowd but did not go near the car. There was testimony on the part of plaintiff that the road was rough and bumpy at the "Y" and that the road there had a high crown and was slanting.

Plaintiff's witness, Malnory, testified that he was seated in his house on the west side of Alice Street opposite the Johnson home; that he saw deceased stop at the Johnson home and then go to the fork or "Y" as usual to turn around; that he saw the automobile stop there; that he did not hear any shot but went up to the car when · he saw the people there; that when he arrived at the car "it was headed just like he was going to pull up there to turn around, and the car was sloping, . . . sloping to the right;" that the witness looked inside the car; that the ignition of the car was on and the ammeter showed "discharge;" that the car was in reverse gear; that

the motor was not running, and the emergency brake was not on; that deceased was sitting "under the steering wheel" and "kinda leaning to the right;" that "he was lying kind of slantways in the seat of the car, and his head was kind of drooped over, wasn't quite down in the seat, about middleways; about the top or middleways, somewhere in there, of the seat. . . . Well, of the seat, kind of —not clear up to the top, but just kind of bit the back of the seat. . . . He was just kind of leaned over (illustrating);" that his right hand was lying in the seat; that he did not know just whether or not it was hanging over the edge of the seat; that the witness was on both sides of the car; that deceased was breathing; that it looked to the witness as though deceased had been shot through the forehead above the right eye; that his forehead was not bleeding to any extent; that "it looked like there was quite a little bit of blood coming from the back of his head;" that the back of his head was "pretty bloody."

Malnory further testified that he saw a pistol on the floor of the car underneath the glove pocket; that it looked like a .38 Iver-Johnson revolver with a pearl handle; that the car was an Oldsmobile; that it had a glove pocket on the right hand side "on the dash board;" that the door to the glove pocket was open; that the pistol was not pointing exactly toward deceased but "it was toward the seat;" that he saw no powder burns on deceased's forehead; that he had never seen a bullet hole in any one's head before or since; that he had seen powder burns on human flesh one time before, which was on the 4th of July, when a fire cracker went off in his hand.

Deceased was taken to the General Hospital in Kansas City, where he died about 5.30 P. M. of the same evening.

Deceased's daughter testified that she saw her father's body at the undertaker's after his death; that she saw some slight damage to her father's head "right up here in the middle of his forehead;" that there was no mark on his head except the bullet hole; that her father was right-handed; that she saw a bruised mark on his hand.

Deceased's brother testified that he saw deceased's body at the undertaker's and there was a bullet hole in his forehead; that the hole was on the right side of the forehead "about at the end of the eyebrow, a little more to the front," at the end of the bone of the forehead, "right where it turns, just as it turns the corner, right here over the eye;" that he looked at the body "fairly close;" that he also saw "a place on his hand that was swollen there and looked like it had been hit or turned black at the time, and those were the only two things I could see happened;" that these were the only marks that he observed, and "I think I was very close to him."

Plaintiff testified that the authorities would not permit her to see her husband in the hospital, but she saw his body the day after his death at the undertaker's; that she did not examine the body very closely; but she saw that a bullet had entered his head "right

above the right eye, at the right temple;" that she did not see where the bullet emerged; that she saw no powder burns or marks other than the bullet hole; that there was a bruise on the back of his right hand.

John Edward Hickey, on behalf of defendant, testified that he was a police officer of Kansas City; that he and officer Sullivan were called to the scene of the casualty and found deceased slumped over on his right arm, his hand (left) was down, kind of on his leg; that he was slumped over to the right; that his hips and body were behind the steering wheel, his head was resting on his arm and his arm was on the seat; that there was a wound on his head, which was bleeding "and it had clogged a good deal," and there was some Grey matter present; that the wound was "around the right ear some place, I don't know just exactly. Q. And above the hairline? A. Well, it seems like it was, yes. Q. And close to the right ear? A. Yes, around up in here (indicating) some place;" that he did not see where the bullet came out; that after he saw deceased he immediately called the sheriff and the ambulance; that two deputy sheriffs and the ambulance came and that the ambulance took deceased away.

He further testified that there were no powder burns; that he had seen powder burns on people; that usually when a pistol is fired at close range there are powder burns "if there was nothing to interfere with it in any way, where you couldn't see it. Q. Well, if you fire a pistol at close range, the powder burn will scorch your hair, wouldn't it? A. Yes. Q. The flash that comes out of a gun? A. Yes."

He further testified that he had never seen anyone shot at close range; that he saw a revolver on the floor of the car "down about where his (deceased's) feet were;" that it was a .38 Iver-Johnson revolver; that it was pointing to the east; that the revolver was lying almost underneath the glove case, a little bit to the east; that the car was facing south and the revolver was pointing east, toward the left side of the car and not toward deceased.

Officer Sullivan, testifying for the defendant, stated that when he arrived at the car deceased "was slumped over sort of to the right, like this (illustrating), with his left hand sort of on his side, here (indicating), he was trying to breathe, very heavy, blood was running out of his head;" that the blood was running "right in high above the right ear;" that deceased's right hand was hanging down over the edge of the seat; that the pistol was on the floor "by the steering gear and pointed to the east, right near the center of the ear, . . . just above his (deceased's) right toe;" that there was "considerable Grey matter and blood;" that he would say that the bullet wound "was in the right temple, or head, about near the top of the ear, as well as I remember (indicating). Q. You are pointing almost— now, you are pointing over the right ear? A. Right in there some-

where (indicating). I couldn't tell you exact, sir." . . . "Q. It was in the hair line, you say, that is, inside of the hair line? A. Yes, sir;" that neither he nor officer Hickey placed their hands upon deceased; that deceased's head "was slumped down quite a ways, but I wouldn't say so near the cushion; it was slumped over, but I couldn't say just how near it was to the cushion. Q. Was his head lying on his arm, as Officer Hickey testified? A. Lying sort of on his shoulder, just dropped over on his shoulder, as near as I can recall it;" that as near as he could tell deceased's head was a foot and a-half from the cushion; that he did not notice any powder burns. "I didn't notice for that, sir, didn't examine for that;" that the car was not exactly level, but was almost level.

Dr. Leitch, testifying for the defendant, stated that he was chief deputy coroner of Jackson County; that he examined the body of deceased at the undertakers; that the body had been embalmed but not prepared at that time; that on his examination for violence he found a circular penetrating would located just above the right ear and a wound of exit located above and behind the left ear; that the course of the bullet from the point of penetration was a little posteriorly and a little upward; that around the wound of entrance there was a very slight ring of powder burn on the flesh and that the brain also showed some burned flecks of powder and a charred appearance; that there was considerable swelling and black discoloration around the eyes; that from the small diameter of the powder burned area, the condition of the interior of the skull and the swelling and discolortion around the eyes, it was his opinion, as an expert, that at the time the revolver was discharged the muzzle was directly against the head; that he had made no record of and could not recall a bruise on deceased's right hand.

Merel R. Gill, testifying for defendant, stated, that he was an expert in ballistics and firearms; that he examined the .38 caliber safety hammer Iver-Johnson revolver, which was introduced in evidence and which there is evidence, was the one which had shot deceased; that the revolver could be discharged only by pulling the trigger, which pushed a safety block up against the hammer and the firing pin; that the gun could not be discharged in any other manner; that the trigger had to be brought to the extreme rear of the guard in order to push the safety block up into position so that the gun could be fired; that a concussion could not explode a shell in the gun.

At the time of deceased's death he was employed as a foreman by a casket company. Defendant's witness, Sutter, testified to a conversation with deceased a few days before his death. The witness stated that deceased told him that he owed several debts, including one to the witness of $15; that he owed about $1000; that he was dis-

tressed about his debts and stated that he wished he was dead, as that was the only way he could get out of them.

Other fellow-employees of deceased testified as to deceased going about with women other than his wife. One witness stated that deceased missed quite a bit of work just prior to his death; that he knew that deceased was taking medicine internally. The bookkeeper at the place where deceased worked testified that the week before his death he was off fourteen and one-half hours, the week before that, he was off sixteen hours, the week before that he worked four hours overtime, the week before that he was off four hours; that each of the two weeks prior to that he worked four hours overtime; that for the three weeks prior to that he worked full time; that he was earning $40 per week.

The evidence showed that deceased was a happy, jolly and good natured individual and that he exhibited these traits up to the last time he was seen at the Johnson home. Some of the witnesses, who testified about deceased going with women other than his wife, stated that they had visited at deceased's home and knew his wife but that they told her nothing of this. Another witness of the defendant testified that deceased mentioned to him about having two girl friends. These, it appears, were Mrs. Johnson and her sister-in-law. Plaintiff testified that she knew at the time all about his going about with these ladies and that they were good friends of the witness. There was evidence that deceased did not go with Mrs. Johnson except when her husband was along. Plaintiff testified that neither she nor her husband had ever been sued for a debt; that he had never taken bankruptcy; that deceased usually told her if he owed any one any money; that the only debt she knew of was the one on her car; that he had two loans at the Morris Plan Bank and he owed a note at the bank; that she knew of no private individual to whom he owed money.

Deceased's brother testified that he had loaned deceased money "several times that he always paid it back;" that he would be gloomy and depressed at those times but as soon as the money was repaid he was all right again; that "he wasn't to say gloomy then, just the way an ordinary fellow naturally feels when he owes money, if he has the right feeling, and that is the way I took it. Q. He wanted to pay it and when he did get it paid he felt all right? A. Yes."

There was evidence that deceased owned several cars but there was no evidence that he owned more than one at a given time.

There was testimony that deceased was treated for syphilis at the General Hospital in 1922 and at that time he showed a 4 plus Wasserman test but that he was not taking medicine at the time of his death. On cross-examination of plaintiff, over her objection, on the ground of privilege, it was brought out by defendant that deceased had been treated for sypilis the winter before his death at the Alfred Benjamin Dispensary; that he was there treated "several months;"

that this seemed to be a return of the syphilis he had in 1922. On re-direct examination she was asked whether, after taking these treatments for syphilis, deceased complained further. She stated, "no." On re-cross examination she stated that these treatments he had in the winter before his death, that is 1935 and 1936, were at the Alfred Benjamin Dispensary. This was over the objection of plaintiff and the matter was privileged. Plaintiff testified that in the winter of 1935 and 1936 deceased had some trouble with his eyes watering; that she could not say exactly whether that was connected with the disease he had. She further testified that so far as her knowledge went deceased's treatments did not extend through July, 1936. Plaintiff testified that the glove case of deceased's car "came open very easily, in fact, almost always if you went over any jolt would jar it open." There was evidence that deceased's domestic life was pleasant and that the family lived on his salary.

Plaintiff, her daughter and deceased's brother testified that deceased never expressed a desire to commit suicide and there is no evidence that he expressed such a desire to anyone else unless the testimony of the witness Sutter can be so construed. We have already alluded to Sutter's testimony. He stated that deceased told him in reference to his debts "a lot of times the only way he could get out of it was he wished he was dead, the only way he could get out of it."

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given "for the reason that plaintiff did not make out a submissible case of accidental death, the undisputed evidence showing that deceased's death was caused by suicide."

It is well settled that when one is dead as the result of an injury coming from violence, the presumption arises that the injury was due to an accident. [Klinginsmith v. Mt. B. H. & A. Assn., 64 S. W. (2d) 705; Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363; Hibbs v. Fid. H. & Acc. Co., 71 S. W. (2d) 764, 765.] This is substantially admitted to be the law by defendant but there is much dispute in the briefs, and some misunderstanding exhibited in the opinions in some of the reported cases, concerning the subject of the burden of proof and the burden of evidence and the shifting of each, and as to the distinction between the burden of proof and the burden of evidence.

There is no doubt but that plaintiff had the burden of proof throughout this case to show that deceased came to his death as the result of an accident. However, when plaintiff showed that he died as the result of an injury from violence, a presumption arose in her favor that his death was due to accident. Some of the cases hold that this presumption is purely one of law, as not being based upon any inference or presumption of fact but is merely a procedural rule, the presumption being raised solely for convenience. [Griffith v. Continental Casualty Co., 299 Mo. 426.] However, when facts are

shown giving rise to a pure presumption of law the burden of evidence shifts to the defendant (but defendant is not entitled to an instructed verdict unless its evidence discloses no damaging or impeaching fact and is uncontradicted). [Guthrie v. Holmes, 272 Mo. 215; Downs v. Horton, 287 Mo. 414, 426, 427; Newton County Bank v. Cole, 282 S. W. 466.] If the defendant produces evidence of the facts, the presumption disappears and has no further place in the case and plaintiff then must produce evidence to meet the facts proved by defendant. [Griffith v. Continental Casualty Co., 290 Mo. 455; State ex rel. v. Allen, 337 Mo. 260; Parker v. Aetna Life Ins. Co., 232 S. W. 708, 716; Ross v. St. Louis Dairy Co., 339 Mo. 982; Brunswick v. Standard Accident Co., 278 Mo. 155; Turner v. Benev. Soc., 224 Mo. App. 463.] However, the love of life is so strong in the normal individual that the courts have taken this circumstance into consideration as an evidentiary fact. [Parker v. Aetna Life Ins. Co., *supra.*] In a case where the evidence discloses a state of facts consistent with either accident or suicide the presumption ''while not evidentiary in character; yet when invoked in the trial of a case, in a way as a constituent of evidence, it undoubtedly accomplishes a function of evidence, *pro haec vice.*'' [Brunswick v. Standard Acc. Ins. Co., *supra,* l. c. 172.] So it would seem that in a case like the one before us the presumption ought not to be said to be entirely devoid of any inference of fact to support it. However, it is unnecessary to go further into the matter as the Supreme Court has plainly pointed out the procedure where the facts, as here, rest on circumstantial evidence. In accident insurances cases, where the evidence concerning the issue is purely circumstantial, then, it must be such as to negative every reasonable inference of death by accident. [Reynolds v. Casualty Co., 274 Mo. 83; Brunswick v. Standard Acc. Ins. Co., *supra.*]

In the Reynolds case, *supra,* it was stated, l. c. 96, 97: ''No legal presumption is more firmly established than that where the act which caused the death may be either accidental or suicidal the burden is upon the insurer to establish the fact of suicide by a preponderance of the evidence, for the presumption arising from the love of life, which is created for its preservation, is, like every natural law, always within the contemplation of the courts. It follows, as is stated by Mr. Bacon in his work on Life and Accident Insurance (4 Ed.), sec. 438, that: 'When circumstantial evidence, only, is relied on, the defense fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident, or by the act of another.' . . .

''These cases and many others to which our attention has been directed, amply sustain the doctrine stated in the proposition we have quoted from Mr. Bacon's excellent book. In the Kornig case, *supra* (102 Minn. 31), the court states it more fully as follows: 'Where

the defense of suicide is asserted against an action by a beneficiary on an insurance policy (a) the burden of proving that the deceased committed suicide is upon the defendant; (b) the presumption is against suicide; (c) if the known facts are consistent with the theory of natural or accidental death, the presumption which the law raises from the ordinary motives and principles of human conduct requires a finding against suicide; (d) when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of natural or accidental death.'

"It is a doctrine that appeals to every just and reasonable mind. It does not relieve the plaintiff from the burden of proving accidental death by a preponderance of evidence as a condition of recovery, but requires that when he has put in evidence circumstances which prove that the death was either accidental or suicidal, the unreasonableness of the theory of suicide must receive due consideration in weighing it against the more reasonable and natural theory of accident. In this case the evidence is purely circumstantial."

In the Brunswick case, *supra,* it is stated, 1. c. 172, 173: the presumption "is not evidentiary in character; yet when invoked in the trial of a case, in a way as a constituent of evidence, it undoubtedly accomplishes a function of evidence, *pro haec vice.* It is to be invoked, or automatically arises, to be exact, when there is no convincing evidence for or against suicide, and in such case, perforce this presumption alone, a finding in favor of accidental death will be upheld. [Fitzgerald v. Barker, 85 Mo. 1. c. 22.] The evidence for or against the fact may be either direct or circumstantial. If the evidence in favor of suicide is wholly circumstantial, then it ought to be such and of such weight as to negative every reasonable inference of death by accident."

The following facts may be said to be undisputed in this case: That deceased came to his death as the result of the firing of a bullet through his head from a revolver; that the revolver could not have been discharged except by "pulling clear back on the trigger;" that the revolver was not discharged while deceased's car was in motion, but a few moments after it stopped.

Defendant also would have us believe that the revolver was discharged close to deceased's head, for the reason the coroner testified that there was a small ring burned around the exterior of the hole in the head and that the burn extended into the brain; that the coroner, testifying as an expert, stated that this, and other conditions he found, would indicate that the revolver was fired against the head of deceased.

However, there is a dispute in the testimony as to the powder burns upon the head of deceased. A number of witnesses testified that they looked at his head and there were no powder burns present. Some of them may not have been qualified to state as to whether there were

powder burns. However, defendant's own witness, Hickey, testified that he had seen powder burns on people and where there is nothing interfering one can see powder burns if the gun was fired at close range and if fired at close range the powder would scorch the hair. There is other evidence to the effect that the hair was not scorched and the hole of entrance was at the hair line.

There was evidence from which it might be inferred that there was much blood and gray matter around the wound and sufficient to hide any powder burn that might have been present, yet, this testimony was contradicted.

Plaintiff's witness, Malnory, testified that while there was much blood on the back of deceased's head, he did not notice very much on the place where the bullet entered it. None of the witnesses who testified that they saw no powder burns stated that they had any difficulty in seeing on account of the presence of blood or gray matter. It is remarkable that none of them mentioned any such difficulty, if it were a fact. There was, therefore, no conclusive evidence that the revolver was discharged at close range so we are not called upon to say that suicide would have been conclusively established, even if the evidence had so shown.

Again, defendant insists that this case is not really based on circumstantial evidence and that "every fact concerning this incident up to the instant and immediately before and immediately after the discharge of the gun is known; the evidence lacks nothing except an eye-witness to the firing of the gun and even that it so clearly shown by the evidence in the case that an eye-witness could add little to the known facts."

Of course, this argument assumes that the revolver was discharged against the head of deceased. It seems to us that there is no direct evidence of the main or principal facts in this case, that is, what occurred at the time the gun was discharged and that, consequently, this is a clear case of circumstantial evidence. Landau v. Pacific Mutual Life Ins. Co., 305 Mo. 542, cited by defendant, is not in point. In that case, l. c. 560, the court states that all the facts were in evidence. The court, l. c. 561, distinguishes the Reynolds and Brunswick cases by saying: "This case differs from Reynolds v. Casualty Co., 274 Mo. 83, and Brunswick v. Ins. Co., 278 Mo. 154, cases cited and strongly pressed by counsel for respondent as supporting their contentions. In each of these cases the evidence relied upon to show the cause and manner of insured's death was wholly circumstantial. It was especially ruled in the Brunswick case, 278 Mo. 154, l. c. 176, following the Reynolds case, that as the facts proved and which tended to show suicide were not sufficient to exclude every reasonable hypothesis showing accident, there was left, on account of the presumption against suicide, an inference of accident sufficient to take the case to the jury. The basis of that ruling was the fact that the

evidence was entirely circumstantial.'' The facts in the case at bar are more like those in the Reynolds and Brunswick cases than those in the Landau case.

We do not think that the evidence in this case is such as to negative every reasonable inference of death by accident. The case would seem to present a situation where the cause of death is more or less in doubt and, if this is true, under the authorities, the presumption of accident adhers in the case.

We take judicial notice of the biological fact that the love of life is strong in the normal individual (Griffith v. Continental Casualty Co., *supra,* and Landau v. Pacific Mutual Life Ins. Co., *supra*), and there was evidence in this case tending to show that there was no reason for deceased taking his life. Deceased was a jolly, good natured person and he seemed to have been in a happy frame of mine the last time he was seen, which was only a few moments before his death. His home life was a happy one and, while there was testimony that at times he kept company with women other than his wife, the circumstances are not such that necessarily any intimate relations should be inferred, at least in connection with some of his friendships. His wife knew of accompanying some of the women in question. However, there were perhaps some incidents of which his wife was ignorant but there is nothing disclosed in relation to them that would cause him to desire to take his life. If his habits had been such as to cause him to spend a great deal of money, going in debt, resulting in a desire to take his own life on account of those matters, then, we say there is no conclusive evidence that he was so heavily in debt as to cause him to want to take that action. There is some evidence that he stated that the only way he could be releaved of his indebtedness was by death, but he did not state that he desired to take his life on that account. It may be inferred that he did not even make this statement and, if he did, that it was merely a momentary feeling, for the reason that the evidence shows that he was practically never depressed; that his debts were not pressing; that he had never been sued and had not taken bankruptcy; that he and his family was living on his salary.

So far as his venereal disease is concerned, the evidence tends to show that he had recovered or practically recovered from that prior to the time of his death. At any rate, there is nothing to conclusively show that it had reached such a stage as to cause him any serious ill health or inability to work and, consequently, to bring about any desire to end his own life. There is nothing to show why he was off from work so much of the time during the last two weeks of his life.

Deceased had just purchased three gallons of gasoline for his car, which would indicate that he had no intention of immediately taking his life. Defendant urges to the contrary but plaintiff is entitled to

the most favorable inference in reference to the matter. Deceased's car was found in a condition indicating that he had not deliberately stopped his car for any purpose, for the reason that the car was found in reverse with the ignition on and emergency brake released. This would indicate that he had been in the process of turning around when the revolver was discharged.

There are many ways in which the revolver might have been discharged, other than by the voluntary action of deceased with the intention of taking his life. The evidence shows that the gun was borrowed by deceased from his brother for the purpose of going hunting, he stating the purpose being "to shoot frogs." At the time deceased drove to the "Y" the gun was some place in the car. It is natural to suppose that it was either on the car seat, in the glove pocket or in deceased's own pocket. When he drove to the "Y" he might have seen a rabbit or some other animal, for that part of the city was apparently not well built up and, in attempting to withdraw the revolver from the glove pocket, might have caught the trigger on the latch or edge thereof, or on the gear shift lever, causing it to fire, while he was leaning over in the act of withdrawing the gun. The revolver is before us. There is some resistance to the pull of the trigger. It has a guard around the trigger but it appears that it would not be impossible for the trigger to catch upon an object such as a latch or protrusion on a glove pocket.

There is another reasonable theory as to the manner in which the revolver might have been accidentally discharged. Owing to the roughness of the road, the glove pocket could have sprung open, and the revolver fallen to the floor or it could have fallen from the seat, and deceased, in attempting to recover it, grabbed hold of it and in returning it to the glove pocket or the seat, struck his hand (he was right-handed) on the gear shift lever or some other object in the car causing some part of his hand to press hard enough on the trigger to discharge the revolver. On the other hand, if the revolver was in the seat or in the pocket of deceased, he might have grabbed it for the purpose of shooting something and struck his hand on the gear shift with the result indicated above. As was stated in Reynolds v. Casualty Co., *supra,* l. c. 98: "The freaks of a gun when not carefully handled are sometimes wonderful," and l. c. 101: "Firearms are treacherous and dangerous and that playing with and we might say handling) them is liable to result unexpectedly is proverbial." All of such matters defendant characterizes as mere speculation and should not be taken into consideration. However, they are no more speculative than defendant's contention that deceased died as a result of suicide. [See Reynolds v. Casualty Co., *supra,* l. c. 101, 102, 104.]

Defendant makes much of the claimed fact that the entrance hole in deceased's head was above his ear and the exit at about the same

relative position at the ear on the opposite side of his head, indicating as defendant contends, that deceased was in an upright position and had fired the gun approximately straight through his head. There was some evidence to so show but there was much other evidence that the bullet entered in a different part of his head. One witness testified that it was at his eye-brow and that it entered at the turn of the forehead and not at the side of his head. Other witnesses said the hole was in the forehead.

We have examined Mut. Benefit, Health & Acc. Ass'n v. Denton, (Tenn.), 124 S. W. (2d) 278; McDaniel v. Met. Life Ins. Co. (W. Va.), 195 S. E. 597; Bayles v. Jefferson (La.), 148 So. 465; Agen v. Met. Life Ins. Co., 105 Wisc. 217, and other cases cited by defendant and find them not in point. In all of these cases the facts vary more or less and the facts are not at all similar to those in the case at bar.

In Mut. Benefit, Health & Accident Ass'n., *supra,* deceased was found dead in an armchair in his office, clasping a revolver, with a bullet hole above and behind his ear. There were powder burns on his hat which was on the floor ''right at the chair.'' Two cartridges were snapped on and not fired. A third one which had been fired had been snapped on two times. He had taken bankruptcy, but had not informed his wife of it. He had 12 cents in the bank and his furniture was mortgaged. There was an insufficient check out and a warrant for his arrest. A criminal case was pending in court but had been continued indefinitely on promise of deceased to pay the check.

In the following cases it was held that the facts would justify a recovery, although the facts in each of them, in our opinion, were not as strong for recovery as those in this one. [Bell v. Kansas City Life Ins. Co., 71 S. W. (2d) 135; Basham v. Prudential Ins. Co., 113 S. W. (2d) 126; Klinginsmith v. Mut. Benefit & A. Ass'n., *supra;* Wiefle v. Conn. Mut. Life Ins. Co., 112 S. W. (2d) 865; Brunswick v. Standard Ins. Co., *supra;* Reynolds v. Casualty Co., *supra;* Parker v. Aetna Life Ins. Co., *supra.*]

At the instance of plaintiff the court gave her Instruction No. 3, telling the jury that the burden of proving that deceased committed suicide while sane was upon the defendant: ''And unless the defendant proved to your satisfaction by a preponderance or greater weight of all the credible evidence in this case that Wilbur E. Gilpin did commit suicide, you cannot find against the plaintiff on this issue.''

The evidence was concluded during the afternoon of the second day of the trial and after the instructions were given and the case argued, plaintiff's counsel arguing her Instruction No. 3, the jury retired to consider its verdict about 5 P. M. and deliberated until about 5:45 P. M., at which time, court adjourned for the day. The next morning the jury resumed its deliberation about 9:30 A. M.

About 11:00 A. M., the jury, by way of the sheriff, informed the court that, in their opinion, there was conflict in the instructions. The court, after reviewing the instructions determined there was conflict in the instructions in reference to the burden of proof and the court, thereupon, as the record recites "withdrew from the consideration of the jury Instruction No. 3, given by the court and returns the remainder of the instructions to the jury." Counsel for defendant then stated: "Just a moment, if the Court please. Don't you think the jury should be informed as to what instruction is being withdrawn. THE COURT: (To the Sheriff): Tell them to reread the instructions. (To which ruling and action of the Court, the defendant, by its counsel, at the time duly excepted." Counsel for the plaintiff then stated: "Just a minute before he goes back. I want to offer, then, this instruction—MR. BYERS: If the court please, the defendant at this time objects to any instruction being given on behalf of the plaintiff. THE COURT: That request will be refused. (To which ruling and action of the Court the plaintiff, by her counsel, at the time duly excepted and still excepts.) THE COURT: (To the Sheriff): All right. Return those to the jury and tell them that those are now the instructions of the Court."

Defendant contends that error was committed in connection with this incident; that the burden of proof was on the plaintiff and that the burden rested on her throughout. Defendant states that plaintiff's Instruction No. 3 was erroneous and for the purpose of this case we shall assume that it was. [See Griffith v. Continental Casualty Co., *supra.*]

It is contended that while the court at this stage of the proceedings could have properly withdrawn the instruction from the consideration of the jury, that the withdrawal should have been in writing. It is also contended that it was improper for the court to communicate to the jury through the sheriff. It is further contended that the jury was not sufficiently instructed, in any event, so as to obviate any confusion in their minds.

It is well settled that a party may not complain of an error in the appellate court unless the reasons for his claim of error are set forth in the lower court and that court given an opportunity to correct the alleged error at the time it is made. [State v. Macy, 72 Mo. App. 427, 431; Boyd v. Pennewell, 78 S. W. (2d) 456; Thornton v. Stewart, 240 S. W. 502.]

However, when a point is desired to be preserved on the action of the court not brought about by one other than the judge no objection is necessary to preserve the point but it is saved merely by noting an exception. [Harding v. Road, 232 Mo. 444.] In the case at bar counsel for defendant did not pursue the course of merely saving an exception to the action of the court but made a suggestion as to the proper procedure. The court then said to the sheriff: "Tell them

(the jury) to re-read the instructions,'' and counsel for the defendant then for the first and only time noted an exception. It is difficult to ascertain from the record as to what matter the exception was aimed. This suggests that possibly no exception was actually taken at the time but that it was afterwards written into the record pursuant to some rule of court allowing such a procedure. While we know that it is not uncommon for trial courts have such rules we cannot take judicial knowledge that the Jackson County Circuit Court has such a one. We do not intend to intimate that such a rule is an improper one, but it may, in practice, sometime prevent counsel from getting all in the record that he may desire it to show. We will construe the record on the theory that the exception was saved at the time of the occurrence. On this theory it may be that counsel was indicating to the court that he was not satisfied that instructing the jury to re-read the instructions was sufficient to acquaint the jury as to what instruction was being withdrawn. However, the court subsequently said to the sheriff: ''Return those (instructions) to the jury and tell them that those are now the instructions of the court.'' No exception was saved to this action of the court. If the sheriff and the jury performed their duties (and it will be presumed that they did) we fail to see how the jury could have been misinformed as to the action of the court in withdrawing the instruction in controversy.

It is quite apparent that the defendant is not now in a position to urge that it was denied the right to argue that the burden of proof was upon the plaintiff. If defendant desired to argue the case further it should have requested the privilege. No exception was taken based upon the ground that the court did not instruct the jury in writing that the instruction had been withdrawn, or to the action of the court in communicating with the jury through the sheriff. In fact it is not clear that the exception was based upon the ground that the instruction given by the court to the jury that they re-read the instructions was not sufficiently definite to prevent confusion in the jury's minds. It is true that defendant's counsel suggested to the court ''don't you *think* the jury should be informed as to what instruction is being withdrawn?'' (Italics ours.) This was not an unequivocal request that the court so instruct the jury. [See Newport v. Montgomery Ward & Co., 127 S. W. (2d) 687, 689; Thornton v. Stewart, *supra*; Boyd v. Pennewell, *supra*.] After this suggestion was made to the court by counsel for defendant, the court stated: ''Tell them to re-read the instructions.'' It appears that the court accepted the suggestion of counsel for defendant for it instructed the jury, through the sheriff, to re-read the instructions. The court, no doubt, thought that this was a sufficient compliance with the suggestion, and if counsel for defendant thought it was not, it was his duty to so state and indicate in no uncertain way what he desired to be done. As before stated, it is impossible to discern

exactly as to what action the exception taken at the time was directed.

This case is unlike that of New Albany Woolen Mills v. Meyers, 43 Mo. App. 124, cited by defendant. In that case it did not sufficiently appear that the jury knew that the instruction had been withdrawn. In the case at bar the jury indicated to the court that it thought the instructions were conflicting but in what respect, the record does not disclose. Consequently, it does not show that the jury had plaintiff's Instruction No. 3 in mind. However, the court instructed the jury to re-read them; that "those are now the instructions of the court," and it is presumed that the jury obeyed the instructions of the court. [Hagen v. Wells, 277 S. W. 581; Meyer v. Pevely Dairy Co., 64 S. W. (2d) 696.] If it did so it knew the instruction had been withdrawn. Aside from this, as before stated, if defendant thought that the court had not sufficiently instructed the jury, it should have called the court's attention to that fact. Counsel merely made a suggestion to the court. The court apparently accepted the suggestion and thought it was properly doing what was suggested.

Plaintiff, on the hearing of the motion for a new trial, introduced the affidavits of eight of the nine jurors who signed the verdict, in which affidavits they said that they understood that Instruction No. 3 had been withdrawn and that they were not influenced by said instruction. Defendant claims that these affidavits were incompetent and we have not considered them for any purpose. We do not pass upon the question of their competency.

It is insisted that the court erred in giving plaintiff's Instruction No. 1, "in that it submitted questions of law to the jury by referring the policy to them for consideration, commented on the evidence by stating what the evidence showed, and was misleading and confusing in form."

The instruction has the jury find that defendant issued a policy in which plaintiff was the beneficiary; that defendant therein agreed to pay $2000 for accidental death. It is claimed that this instruction submits a question of law to the jury. This part of the instruction is followed by everything necessary for the jury to find in order to make a case for plaintiff. While, it was unnecessary for plaintiff to have submitted the matter complained of, it did no harm.

The instruction is unlike the one in O'Ferral v. Met. Life Ins. Co., 121 S. W. (2d) 304, cited by defendant. In that case the instruction had the jury find that the accident was of the kind mentioned in the policy; that the occurrence happened "under the terms set out in the policy" and "within the terms of said policy". Nothing like this appears in the instruction in the case at bar.

The instruction states the "Court instructs the jury that if you find and believe from the evidence . . . and if you further find

that said Wilber E. Gilpin, on August 22, 1936, if so did die as a direct result of injuries effected solely through external, violent and accidental means, if so, as shown by the evidence submitted for your consideration, if so, while said policy was in full force and effect, if so.''

It is claimed that the phrase ''as shown by the evidence and submitted for your consideration'' might be misunderstood by some member of the jury to mean that the evidence submitted for the consideration of the jury actually showed that deceased did die as a direct result of injuries effected through an accident and that, the words ''if so'' do not change the result; that ''The phrase, 'if so', might very well be taken as meaning that the issue or question, was one for decision by the jury; but such an understanding would not in the slightest degree change the fact that the jury had understood the judge to have indicated to them that he, personally, was of the opinion that the indicated facts were shown by the evidence.'' We think there is no merit in this contention. [Young v. Mo., K. & T. R. Co., 100 S. W. (2d) 929; Good v. M., K. & T. R. Co., 97 S. W. (2d) 612.]

Defendant also complains that the instruction contains too many ''if so's'' and contends that, in this respect, it tends to confuse the jury. We find that the instruction does contain more ''if so's'' than is necessary. In some instances they serve no purpose whatever and can be given no meaning. However, we fail to find that they tended to confuse the jury. In those instances where they are unnecessarily inserted they fail to add anything to the instruction but no confusion appears. While, the giving of too many ''if so's'' has been criticized, it has not been held to amount to reversible error. [Keith v. Kansas City, 118 S. W. 513.]

It is insisted that the court erred in refusing to admit the introduction in evidence of defendant's exhibits ''J'' and ''K''.

Exhibit ''K' consists of a statement signed by deceased and given to the Alfred Benjamin Dispensary to the effect that he had a dangerous communicable disease; that he would continue under the care of a physician until cured; that if he changed physicians without notifying the first physician or ceased taking treatments before he was cured that the agreement might be sent to the Health Department, of Kansas City. This statement is dated 2/10/36.

Defendant admits that Exhibit ''K'' may have been only cumulative evidence, and its exclusion not prejudicial.'' There is no doubt but that it was merely cumulative for the reason that plaintiff admitted that deceased had syphilis in the month of February, 1936. There was no error in its exclusion.

Defendant's Exhibit ''J'' consists of a record of the Alfred Benjamin Dispensary. It is well settled that where it is made to appear that such hospital records come within the term of the statute, section 1731, R. S. 1929, concerning privileged communications between

physician and patient, such records are inadmissible in evidence. [Vermillion v. Prudential Ins. Co., 230 Mo. App. 993; Vermillion v. Prudential Ins. Co., 83 S. W. (2d) 45.]

Defendant contends that it was not made to appear that the hospital record came within the statute. We think the record on its face shows to the contrary. It shows on its face that it consists largely of a history given by deceased to the person who made it out; that insured had been suffering from syphilis for sometime prior to his treatments at the dispensary; that on February 11, 1936, he had a 4 plus Wasserman and 4 plus Kahn. Under the heading "Treatments" is shown dates from 2/13/36 to 7/30/36 and that a certain amount of "Bis" and "Mth IV" had been prescribed. Nothing else is disclosed under this heading. Of course, the value of the record to defendant was the showing that he was treated in the summer of 1936 up to July 30 of that year. The whole exhibit was offered. We think it discloses on its face confidential communications and that it was inadmissible.

It is insisted that plaintiff waived the privilege because she testified to the fact that deceased had syphilis and that he was treated at the Alfred Benjamin Dispensary in the winter of 1935 and 1936. Assuming that plaintiff coulld have waived the privilege, she testified to these facts on cross-examination and only after objection had been made by counsel for plaintiff. It is true, on re-direct examination, plaintiff's counsel interrogated her in reference to these matters brought out on cross-examination but this was only after counsel had done all he could to prevent the evidence being brought out. There was no waiver. The case of Blankenbaker v. St. Louis-San Francisco R. Co., 187 S. W. 840, cited by defendant is not in point because in that case plaintiff, as a part of his case brought out the privileged matter.

It is insisted that the court erred in excluding defendant's Exhibit "B", which consists of a certified copy of the death certificate on file with the Bureau of Vital Statistics of the State of Missouri. The court offered to permit defendant to introduce all of this exhibit except wherein it is stated: "Shot self in the head" and "Suicide". This exhibit was inadmissible in evidence for the reason that it is signed by the coroner.

The records of the General Hospital dated 8/22/36 relating to deceased's case were introduced in evidence by plaintiff and state: "Hour admitted: 4:15 P. M. Wilber Gilpin, 9010 Independence Road. Diagnosis: Gunshot wound in head. Final diagnosis: Gunshot wound of head. Condition of discharge: Death. Date of discharge: 8:22:36. *Dr. E. Lee Miller and Dr. McMillan, house staff physicians.* Treatment record: Patient brought in with gunshot wound complete through head, died without regaining consciousness. Patient admitted via cart."

Exhibit "B" was inadmissible because the certificate was not signed by one of the last attending physicians. There was no evidence that the case had been referred to the coroner by the state registrar at any time. [See section 9046 et seq.; Patrick v. Employers Mut. Liability Ins. Co., 118 S. W. (2d) 116; O'Dinnell v. Wells, 21 S. W. (2d) 762, 765. See, also Schmidt v. Supreme Council of Royal Arcanum, 207 S. W. 874, 877.] The coroner testified at the trial to substantially the same matters as covered by the death certificate made out by him.

The judgment is affirmed. All concur.