Lois M. BORING, Appellant,

v.

KANSAS CITY LIFE INSURANCE
COMPANY, a Corporation,
Respondent.

No. 44373.

Supreme Court of Missouri.

Division No. 1.

Jan. 10, 1955.

234

Dwight Roberts, Earl J. Boughan, Kansas City, for appellant.

Ray B. Lucas, Jos. R. Stewart, Kansas City, for respondent.

HOLLINGSWORTH, Judge.

This is an action to recover accidental death benefits under a $5,000 policy of insurance issued by defendant on the life of Eugene E. Boring, in which plaintiff, Lois M. Boring, the wife of insured, is the beneficiary. The insured was found dead from a gunshot wound on November 12, 1950, while the policy was in effect. Defendant, upon proof of death, paid the face amount of the policy, but denied liability under a double indemnity provision to the effect that if death of the insured resulted from accidental means as therein defined it would pay an additional sum of $5,000. The petition alleges vexatious refusal to pay said additional sum and prays judgment for $5,000, together with a penalty of 10% and attorney's fees in the sum of $2,500, a total of $8,000.

Trial of the issues resulted in a verdict and judgment for defendant. Plaintiff appealed, alleging error in the refusal of the trial court to permit Dr. Gus C. Salley, an osteopathic physician, to give in evidence his opinion as to which of three gun-

shot wounds found in the body of insured was fired first; and in the refusal of an instruction declaring that there was a legal presumption that the death of insured was accidental and not self-inflicted or intentionally inflicted by another.

The pertinent provisions of the policy are:

"If the death of the Insured shall result, directly and independently of all other causes, solely from bodily injury, effected directly by external, violent and accidental means, * * *, the Company will pay the sum of Five Thousand Dollars, * * *; provided that there shall be no liability under this provision for additional indemnity for death by accidental means for death resulting from self-destruction, while sane or insane, or from injury intentionally inflicted by another * * *."

Plaintiff placed in evidence the insurance policy and the official certificate of death and rested her case in chief. The certificate recites the cause of death as "(a) Shot through head by 16-gauge shotgun" and "(b) Also two other shots into abdomen by a 16-gauge shotgun."

Defendant's evidence:

The insured and plaintiff resided at Warsaw, Missouri, where insured operated a retail drug store. He was past 43 years of age at the time of his death on Sunday, November 12, 1950. A deposition of plaintiff introduced in evidence by defendant revealed that on Friday, November 10th, insured seemed worried, was just worried; on Saturday morning, November 11th, at breakfast, he was extremely worried and said that someone was trying to blackmail him, but he made no further explanation of the matter. He was perfectly normal in his speech and manner. That evening, he and plaintiff ate supper with their children, at which time he again mentioned blackmailing and named a certain man. He had never been sick, was a cheerful man and successful in his business. At 8:30 a. m., on Sunday, November 12th, dressed in a business suit, insured left his home for his

place of business. Plaintiff went to church at 11 o' clock. Upon her return, she found insured's dead body, dressed in hunting clothes, lying on its side back of their garage.

Deputy Sheriff Ben Jenkins arrived at the scene at about 12:10 noon, where he found insured's body lying on its right side. A 16-gauge Winchester pump shotgun was by his side, almost parallel with his body, the muzzle close to the mouth of deceased. His left arm was extended "right toward the stock where the fingers of his left hand were within two inches of the trigger." Two discharged 16-gauge shotgun shells were found near the body and a third discharged shell was still in the chamber of the gun. The gun measured 32 inches from the trigger to the muzzle. The body was dressed in hunting clothes. A light cloth jacket with zipper front, part-way zipped up, was on the body. The jacket was zipped up to a point that covered two wounds in the abdomen, which were not discovered until the body was undressed at the funeral home.

Jenkins examined the ground around the body for signs of a struggle or scuffle but found no such marks. The two empty shells were picked up and the gun with one empty shell partly ejected was placed in Jenkins' car.

Jack Reser, Sheriff of Benton County, saw insured's unclothed body about 4 o'clock that afternoon at the Reser Funeral Home, where witness was also an embalmer. He completed the embalming of the body. There were gunshot wounds in the left abdominal cavity and one in the mouth. He did not recall seeing any marks, cuts or bruises on the lips or outside of the mouth. He and Deputy Sheriff Jenkins and State Patrolman Glen Means fired three or more shells from the shotgun found by the body of deceased. These fired shells, together with the fired shells found by the body and in the shotgun and the shotgun, were delivered to the state patrolman.

On cross-examination, the sheriff identified a 16-gauge shotgun handed him by plaintiff's counsel as being the shotgun found by deceased's body and explained in detail its working parts. (We have found no direct admission in the record that the shotgun produced was the property of the insured, but the fact seems to be conceded.) It holds three shells. If there is a shell in the barrel chamber, it can be fired once without pumping, but cannot be fired again without a manual pumping action.

State Patrolman Glen Means saw the clothed body of deceased about 12:50 p. m. It was then being moved to the funeral parlor. Deceased had on hunting trousers, laced boots, a light zipper jacket and a hunting belt. The jacket was zipped up about halfway to the collar. There was blood on the barrel and inside the muzzle of the gun. The blood in the muzzle indicated that the barrel had to be in deceased's mouth a short while after it was fired or in the corner of the mouth where it could run out into the barrel. Witness compared the length of his arm with that of deceased and found they had about the same reach. He then held the muzzle beside his mouth and was able to reach the trigger. Witness wrapped a paper around the gun, the fired shells were marked, and all were taken to the State Highway Patrol Headquarters Laboratory in Jefferson City. Witness also took deceased's fingerprints at the funeral parlor and sent them to the laboratory.

John F. Williams, a graduate chemist in charge of the laboratory of the State Highway Patrol and extensively experienced in scientific investigation, examined the shotgun for fingerprints. Only two legible fingerprints were found. They were those of deceased. The three discharged shells found by the body of deceased and four shells fired from the gun by Trooper Means were found to have been fired from the same gun.

Dr. A. W. Moreland, an osteopathic physician and surgeon, Coroner of Benton County, saw the body of deceased at the Reser Funeral Home. The zipper on the jacket worn by deceased was zipped about halfway between the waist and collar. Witness unzipped the jacket and then no-

ticed two gunshot wounds in the abdomen. These wounds could not be seen before the jacket was unzipped. There were no holes in the jacket. Powder marks about the size of the shots were around the wounds and on the undershirt, which had only one hole in it, about the size of a half dollar. There was a similar hole in the outer woolen shirt, which also had powder marks around it. There was no blood on the outer shirt and only a small amount on the undershirt. There was a gunshot wound back of the soft palate, "clear back to the back of the throat." The abdominal wounds, one about an inch below the other, were in the left upper quadrant of the abdomen, three inches left of the midline and an inch below the intercostal margin.

Witness, assisted by Dr. Gus C. Salley, performed an autopsy. "In opening the abdomen the small intestine was completely severed in one place. The entire viscera of the abdomen was badly traumatized due to the two gunshots in to the abdominal cavity. There was a small amount of free fluid mostly blood, I would say less than a pint of blood from the small vessels. There were no large vessels, in other words, the large abdominal artery (aorta) that lies just on top of the back bone was not injured at all, wasn't punctured at all. * * * The crest of the left ilium (hipbone) was splintered off due to the lower gunshot wound which was directed back but more downward * * * than the above gunshot wound. Many small shot were found in the abdominal cavity * * *. In other words, most of the shot were down in here in the lower part of the abdominal cavity, none of the shot went clear through * * *. The superior wall of the abdominal cavity, which is called the diaphragm, * * * was not injured nor was there any shots that entered into the chest cavity. * * * The upper shot, we could tell it went more straight in, a little downward, and then the other, we could tell it went more downward, had to in order to splinter the crest of the ilium. There was also one shot fired through the mouth entering the posterior wall of the throat or soft palate. That is right straight back as far as you can

go. This shot was in the direction of upward and to the right but failed to go through the skull. * * * On examination the skull had multiple fractures. * * * Massive destruction of the brain tissue. * * *, the brain tissue was coming out through some of the fractures. The jaw bone or mandible * * * was fractured in one or two places. * * * The maxilla, this bone right up here where the teeth are fastened to the maxilla bone, was completely fractured in a horizontal line one-fourth inch below the nasal orbit. * * * You could take it and move it around."

There was more than a half pint and less than a pint of blood in the abdominal cavity. There were no external bruises or cuts around the mouth or lips, but the face and eyes were discolored and swollen from the inside trauma. Witness testified he did not have enough experience to form an opinion whether the gun was fired first into the abdomen or into the mouth, but it was his opinion that the shot into the mouth caused instantaneous death and that the shots fired into the abdomen were not instantaneously fatal.

Dr. Victor B. Buhler, a practicing physician since 1934, specializing in pathology, a member of numerous professional societies including the American College of Pathologists, and having extensive wartime experience in the examination and treatment of all kinds of gunshot wounds, was shown Dr. Moreland's autopsy report. A hypothetical question, including the facts set forth in said report and the testimony of defendant's witnesses as to the physical facts found by them as above outlined, was then propounded to him asking his opinion whether the gunshot wounds in the abdomen were inflicted before or after the wound in the mouth. It was his opinion that the wound in the mouth was the cause of death and that the wounds in the abdomen could have been inflicted before the one inflicted in the mouth.

The reasons given by the witness in support of his opinion were: "There was a quantity of blood found in the abdominal

cavity, between a half and one pint, which would mean then those wounds were inflicted prior to his death. If they were inflicted after his death there would be either no blood or only a small amount of blood, not over maybe an ounce or two that would be present in the abdominal cavity. So it would seem that with the finding of this amount of blood in the abdominal cavity there was heart action after the wounds in the abdomen were inflicted and therefore would precede the wound in his mouth which probably caused rather sudden, instant death." The heart thereupon ceases its action immediately.

The witness further testified that the autopsy report showed the wounds in the abdomen traversed downward toward the pelvis so that they would miss the aorta or big blood vessel that carries blood through the center portion of the abdomen and would also miss the spleen. It was the witness's opinion that a man of the physical characteristics of the insured would be able to shoot himself in the abdomen twice and then put the gun in his mouth and pull the trigger. The witness had seen men in war who had been wounded as extensively as the insured, excluding the mouth wound, who had been able to walk several miles to a relief station.

In rebuttal, Dr. Gus C. Salley, an osteopathic physician with 27 years experience, testified in behalf of plaintiff: He had experience with gunshot wounds. He saw the unclothed body of deceased at the morgue late on the evening of his death and assisted Dr. Moreland in the autopsy. There was no blood where the shots entered the abdomen. One was directed so that the impact of the load hit toward the midline where the backbone swings forward into the abdominal cavity. These shots necessarily involved the aorta. The destruction was immense, a segment of intestine had been completely severed. Witness took X-ray pictures. They revealed a mass of shot in the extreme lower pelvis where there are some major blood vessels, about the size of a lead pencil coming from the aorta.

Witness further testified that there was a negligible amount of blood in the cavity, considerably less than a pint. The witness gave his opinion, based upon his past experience and examination of deceased, that the shot in the head was fired first. On defendant's objection that the witness had not been qualified to testify as an expert on gunshot wounds, the answer of the witness was stricken, at which time the court suggested that plaintiff could qualify the witness. The witness again stated that if deceased had been shot in the stomach first, he would have found probably a quart, perhaps two quarts of blood in the abdomen. This testimony likewise was stricken on defendant's objection that the witness had not been qualified to express an opinion as an expert on what he might have found, the court again suggesting that plaintiff "qualify the doctor and he may testify as an expert." Plaintiff then offered to prove by Dr. Salley that if the shots in the abdomen had been fired first, there would have been a great deal more bleeding in the abdominal cavity from the ruptured blood vessels. The offer was denied.

On cross-examination, Dr. Salley testified that the main aorta, the main blood vessel along the spine, was shattered by the blast in the abdomen. The little blood vessels were severed, the big one was punctured, the aorta. Upon being referred to the autopsy report, he stated that the small blood vessels, the ones coming from the aorta, were the ones severed. He did not mean to infer the big vessel (aorta) was cut in two because it was not. If it had been cut in two, the belly would have been full, a gallon or two. If the aorta had been nicked, blood would merely have squirted, but it would have been more than the pint he found there.

On redirect examination, Dr. Salley testified without objection:

"Q. Now, if the man had been living at the time that shot had been fired would there have been a great deal more blood in the abdominal tract than you found? A. The abdominal cavity, yes.

"Q. A great deal more blood? A. Yes.

"Q. How much more blood? A. Well, that is a problematic figure, maybe a quart of blood or two quarts of blood.

"Q. Somewhere between one quart and two quarts? A. Yes.

"Q. Was there any blood on the outside of his stomach or underclothes? A. Not a drop.

"Q. If he had been living at the time he was shot in the stomach would he. have bled through that hole in his stomach? A. Yes, sir."

Did the trial court commit reversible error in excluding plaintiff's proffered opinion of Dr. Salley that the shot fired into the head of deceased was the first shot fired?

■ "Whether or not the qualification of a witness to state his opinion is sufficiently established is a matter resting largely in the discretion of the trial court, and its ruling thereon * * * ordinarily will not be disturbed on appeal unless there is a clear showing of abuse." 32 C.J.S., Evidence, § 458, p. 99; White v. Atchison, Topeka & Santa Fe Ry. Co., Mo.Sup., 244 S.W.2d 26, 30. See also Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122, 130.

■■ However, the great weight of authority is that "It is proper for a medical expert to testify and give his opinion either from facts within his own knowledge and observation or from hypothetical facts, or from the two combined." De Donato v. Wells, 328 Mo. 448, 41 S.W.2d 184, 187[1–4], 82 A.L.R. 1331; Prince v. Metropolitan Life Ins. Co., 235 Mo.App. 168, 129 S.W.2d 5, 8[7, 8]; De Maet v. Fidelity Storage, Packing & Moving Co., 231 Mo. 615, 132 S.W. 732, 734; Kelley v. Kansas City Building & Loan Ass'n, 229 Mo.App. 686, 81 S.W.2d 440, 446[11]. "Medical experts are entitled to base their opinions upon the teachings of medical science, and are not limited to expressing opinions only as to subjects with which they are familiar through their own observation and experience. * * * A rule which precluded an expert from expressing an opinion based upon the teachings of his profession would be unsound and impractical." Woelfle v. Connecticut Mut. Life Ins. Co., 8 Cir., 103 F.2d 417, 418[1], and cases therein cited.

■ We are constrained to hold that it was error to exclude Dr. Salley's opinion upon the ground he was not qualified. But we are further convinced that the error was not prejudicial.

In the first place, an opinion based solely upon the amount of blood found in the abdomen would be highly conjectural because it failed to take into consideration a patently essential fact, to wit: the relative (in point of time) lethal effectiveness of the shots fired into the abdomen as compared with the shot fired into the head. The testimony that the head wound was instantly fatal and that the abdominal wounds were not instantly fatal is unquestioned and highly significant. It is obvious that if the instantly fatal shot was fired into the head quickly after the shots into the abdomen, the instantaneous cessation of heart action resulting from the head wound would immediately stop any considerable flow of blood into the abdomen except such as would ooze from the punctured vessels. Consequently, it does not follow that a finding of a small quantity of blood in the abdomen is decisive that the shot into the mouth was the first shot fired, and any conclusion to that effect amounts to mere conjecture. The scintilla of evidence doctrine is no longer the rule in Missouri. Wallingford v. Terminal R. R. Ass'n of St. Louis, 337 Mo. 1147, 88 S.W.2d 361, 366[5–7]; Hardwick v. Kansas City Gas Co., 352 Mo. 986, 180 S.W.2d 670, 673.

■ In the second place, assuming that the doctor's opinion was of some evidentiary value, yet he was thereafter permitted to state his opinion, based upon the amount

of blood found in the abdomen and his finding of only a trace of blood on the outer abdominal wall or underclothing, that the insured was dead at the time the shots were fired into the abdomen. Of course, it necessarily followed, as any juror would know, that it was the doctor's opinion that the the head wound was the first inflicted. "It is * * * well settled that, if in a specific instance the evidence should not have been excluded, the error is harmless if the same evidence is found in the testimony of the same or other witnesses, given before or after the objection was sustained." Steffen v. Southwestern Bell Telephone Co., 331 Mo. 574, 56 S.W.2d 47, 48[1–3]. See also Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418, 424[6]; Sandler v. Schmidt, Mo.Sup., 263 S.W.2d 35, 40[8].

Plaintiff next contends that there was no evidence of suicide and that it was error to refuse his proffered instruction to the effect the death of insured from gunshot wounds "creates the legal presumption that his death was an accident or by accidental means and was not self-inflicted or intentionally inflicted by another, and this presumption continues throughout this case unless it is overcome by credible evidence * * *."

█ As hereinabove stated, plaintiff relied upon the well-grounded doctrine that the certificate of death alone raised a legal presumption that insured's death resulted from accidental means, which placed upon defendant the burden of going forward with evidence to establish its pleaded defense of non-accidental death. This burden defendant met by the production of substantial and, with the exception of the highly conjectural opinion of Dr. Salley, unquestioned evidence of physical facts tending to show that insured's death was intentionally self-inflicted.

The physical facts refute any other conclusion. The evidence shows that the first shot could have have been accidentally fired but that the second and third shots necessitated a manual pumping of the gun, thereby excluding any possibility of its accidental discharge. Certainly, if the second and third shots were intentionally fired, it is reasonable to infer that the first was also intentionally fired. The muzzle of the gun had been inserted downward into deceased's partially "zipped-up" jacket and later placed into his open mouth without any exterior injury to his face, denoting purposeful acts on his part. The blood in the muzzle of the gun must have come from the shot fired into the mouth because the abdominal wounds showed scarcely any exterior bleeding and there was no blood on the outer shirt. The conclusion is irresistible that the shots into the abdomen were fired first; had they been fired after the blood from the mouth wound flowed into the muzzle, the blood would have been blown from it or so burned as to destroy its characteristics. The position in which the body and gun were found corroborates the conclusion that the shots were self-inflicted. There is not a scintilla of evidence that any third person was present. Only deceased's fingerprints were found upon the gun. The bald conclusion of Dr. Salley, based solely upon the amount of blood found in the abdomen, that the shot into the head was fired first (carrying with it the necessarily further conclusion that some unknown person had fired the shots) does not destroy the probative value of these undisputed facts.

█ Under the pleadings, the burden of proof to establish that the death of insured resulted from accidental means rested upon plaintiff and there remained until the end of the case. If the jury, after hearing the evidence, was unable to find that insured's death was accidental, then defendant was entitled to a verdict. Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043, 1048. In that case the court said, loc. cit. 1048: "But it is said that the applicability of the fundamental rules of procedure above referred to is in this case modified or destroyed by the presumption against suicide which arises on the evidence. This insistence is based upon a misconception of the nature and office of such a presumption. The presumption

against suicide is a rebuttable legal presumption. [Case cited.] In its character as a presumption it is not evidence; it is a mere rule of law which operates to throw upon the party against whom it is raised the duty of going forward with the evidence. * * * It performs no other function and has no other significance."

In Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S.W. 45, 50, 7 A.L.R. 1213, we said: "If there is evidence both for and against suicide, the presumption * * * has no place in the reasoning, as its very nature indicates. If, therefore, invoked, or present, it vanishes and the question is to be thereupon resolved upon the evidence. * * * Obviously, the presumption against suicide cannot continue to exist in the face of evidence showing suicide, for such a view would be utterly subversive of the well-settled doctrine, figuratively but strikingly announced by Lamm, J., substantially, to wit, that presumptions are the bats of the law, which the light of evidence frightens and causes to fly away." See also Bowdon v. Metropolitan Life Ins. Co., 227 Mo.App. 710, 59 S.W.2d 787, 789; Hendrix v. Metropolitan Life Ins. Co., Mo.Sup., 250 S.W.2d 518, 520–521; Reliance Life Ins. Co. v. Burgess, 8 Cir., 112 F.2d 234, 238; O'Brien v. Equitable Life Assur. Soc. of U. S., 8 Cir., 212 F.2d 383, 387–388.

The cases cited by plaintiff are not in point. In Basham v. Prudential Ins. Co. of America, 232 Mo.App. 782, 113 S.W.2d 126, 131, the court held it was not error to instruct the jury upon the presumption against suicide where "there are no facts from which an inference may be drawn, for or against, then the presumption against suicide must be regarded by the trial court." In the remaining cases no instruction such as tendered by plaintiff herein was involved. Those cases are Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S.W. 45, 46, 7 A.L.R. 1213; Gilpin v. Aetna Life Ins. Co., 234 Mo.App. 566, 132 S.W.2d 686, 692–693; Edwards v. Business Men's Assurance Co., 350 Mo. 666, 168 S.W.2d 82, 88–90.

The trial court did not err in refusing the instruction.

The judgment is affirmed.

All concur except WESTHUES, J., not sitting.